### GOODRICH v. FORD MOTOR CO.
### No. 7357.

Circuit Court of Appeals, Sixth Circuit.

May 4, 1938.

Rehearing Denied June 29, 1938.

Francis D. Hardesty, of Detroit, Mich. (Swan, Frye & Hardesty, William M. Swan, Francis D. Hardesty, and John C. L. Cowen, all of Detroit, Mich., on the brief), for appellant.

Frank Parker Davis, of Chicago, Ill., and I. J. Farley, of Detroit, Mich. (Bodman, Longley, Bogle, Middleton & Farley, of Detroit, Mich., Frank Parker Davis, of Chicago, Ill., and I. Joseph Farley, of Detroit, Mich., on the brief), for appellee.

Before HICKS and SIMONS, Circuit Judges, and LEDERLE, District Judge.

HICKS, Circuit Judge.

Suit against Ford Motor Company, appellee, for infringement of claims 1, 2, and 3 of letters patent 1,285,129, issued November 19, 1918, to George N. Goodrich, for a "Multi-Cylinder Engine." The chief defenses were noninfringement and noninvention. The District Court decreed that the patent was valid but not infringed.

The patent related to fuel distribution in and manifolding for multi-cylinder engines, and especially those having two opposed blocks of cylinders known as the "V-8." Simply stated, such engines are power plants, designed for automobiles, to transmute the explosive power of gasoline into smooth-flowing motion. Obviously, if the crankshaft of the motor is not properly counterweighted, or if the explosions within its various cylinders are variable, the power generated would be irregular and result in vibration.

Goodrich testified: "I have personally driven V-8 engines at sixty miles an hour where the vibration was so severe as to transmit it to the steering wheel,— * * my hands were completely numbed. * * I had to reduce speed. Anyone would be led to believe it would be almost an impossibility to hold that engine in the frame of the car. * * * That was, you might say, the motivation for the serious thought that resulted in the issuance of this patent in suit."

His claim is that all three claims of the patent are infringed by the V-8 cylinder engines manufactured by appellee since 1933.

The unit of power in a gasoline motor is a single cylinder, into the firing chamber

of which a gaseous mixture of air and gasoline is introduced through a pipe from the carburetor. On either side of this chamber are valves which open and close periodically. The feed valve is at the terminus of the pipe leading from the carburetor and the exhaust valve at the entrance of the pipe leading to the exhaust. The explosion takes place within the cylinder and its force is expended against the piston which slides back and forth therein. The piston is movably joined to the crankshaft by a connecting rod in such a way that the crankshaft revolves in an axis at right angles to the axis of operation of the piston.

The part where the connecting rod communicates its power to the crankshaft is called the "throw." The shape of the crankshaft controls the valve action and also the shape of the manifolding, which latter is the gist of the law suit.

As the crankshaft makes one complete revolution, the piston makes two strokes, one up and one down. Revolve the shaft twice, through 720 degrees of circular motion, and the piston makes four strokes. Four full strokes of the piston are necessary for one power stroke in a power producing cycle. The explosion takes place just as the piston passes the top of its stroke, and starts downward. Both valves are closed and the force of the explosion is exerted on the downwardly moving piston. This is the "working" stroke. When the piston reaches bottom and starts back up, the exhaust valve opens and the movement of the piston drives the spent gases out through the exhaust valve. This is the "exhaust" stroke. Again, as the piston starts down the second time, the exhaust valve closes, the intake valve opens and the new charge is sucked into the chamber from the carburetor by the vacuum behind the piston. This is the "intake" stroke. Finally, at approximately the time the piston starts back up on the fourth stroke, both valves close and the gas is compressed by the piston head into a small space. This is the "compression" stroke and the cylinder is now set for another working stroke. These four operations give rise to the term "four phase" or "four cycle" motors.

With a four throw crankshaft of the type of appellant's Exhibit No. 3 and a motor of four cylinders, each cylinder going through the four 180 degree cycles crankshaft motion, and each firing at the beginning of 720 degrees of crankshaft revolution, there are only two possible firing orders. Cylinder one fires when its throw is up, throws two and three come up and either two or three must fire, then four comes up and its cylinders fire, and then two or three. The order then is, 1, 2, 4, 3 or 1, 3, 4, 2 in endless succession.

The throws of this crankshaft, being 180 degrees apart as it revolves, are in the same plane, so that the crankshaft is flat. Thus, the shaft tends to be in balance, since each throw is offset by one 180 degrees away, there being two throws on one side of the bearing and two on the other.

The cylinders of a four-cylinder motor were ordinarily placed vertically over the axis of the crankshaft. The V-8 motors on the other hand had two banks of four cylinders each, inclined toward each other, usually at an angle of 90 degrees, and converged toward an intersecting line, within which the axis of their common crankshaft lay. The early V-8 motors, with one or two possible exceptions, used the ordinary, flat, 180 degree crankshaft, having only four throws, the piston rods from directly opposite cylinders, one in each bank, engaging the same throw. Thus, the earlier V-8 engines actually comprised two four-cylinder engines acting upon one ordinary four-throw, flat crankshaft, with the explosions in their cylinders, occurring in a continuous and uniform succession, with intervals of 90 degrees of crankshaft rotation, between the beginnings of each two immediately succeeding cycles.

The firing sequence dictated by the flat crankshaft then was the alternate firing, first of a cylinder in one bank, and then of a cylinder in the other, with a continuous repetition of such bank-to-bank firings.

Then came the so-called 90-degree crankshaft, bringing the complications in firing and manifolding which led to this suit.

The only types of this 90-degree crankshaft of interest here are: (1) The shaft shown in figure 4 of the Goodrich patent in which throws 1 and 2 were in the same plane with each other, but 180 degrees apart, and throws 3 and 4 likewise in the same plane with each other, and 180 degrees apart, but lying in a plane at an angle of 90 degrees to the plane of the

throws of 1 and 2; and (2) the shaft used by appellee in which throws 2 and 3 are in the same plane 180 degrees apart, and throws 1 and 4 in the same plane and 180 degrees apart, but in a plane at an angle of 90 degrees to the plane of throws 2 and 3.

With the use of the 90-degree crankshaft, it was mechanically impossible to use the simple back and forth firing order of the 180-degree shaft. The firing order used by appellee wherein the first cylinder in the left bank was designated 1, and the others in order, 2, 3, 4, and the first cylinder in the right bank 5 and the others in order 6, 7, 8, was 1, 5, 4, 8, 6, 3, 7, 2. In the Goodrich specification the cylinders in the left bank were numbered 1, 2, 3, 4 from front to back and those in the right bank 8, 7, 6, 5, from front to back. Goodrich's optional firing order was 1, 3, 6, 4, 5, 8, 2, 7. It will be seen that these two firing orders have one thing in common, namely, that two cylinders in the right bank and two cylinders in the left bank have immediately successive firing orders. In appellee they were 2 and 1 in the left bank and 8 and 6 in the right. In Goodrich 1 and 3 in the left bank and 5 and 8 in the right. This was unavoidable, being inherent in the 90-degree crankshaft construction.

This successive firing of two cylinders in one bank in advance of the firing of a single cylinder in the other was the vice that Goodrich claimed to correct. In a single cylinder on the intake cycle the downward stroke of the piston tends to create a vacuum which draws the gas mixture into the cylinder from the carburetor by way of the manifold. Goodrich's theory was that if two cylinders successively sucked the mixture into the piping feeding the cylinders of one bank, there was created a heightened suction, or inertia, toward that bank which could not be completely overcome by the suction from the single cylinder following, in the opposite bank, with the result that the latter cylinder received a lesser charge and in fact was "starved" by the double suction opposing it. This condition the patentee called "double inertia." The two preceding cylinders, each having to draw against the suction of but a single cylinder, received normal charges of gas, with the result that their explosions tended to be of equal intensity. The explosion in the "starved" cylinder, on the other hand, tended to be weaker, causing unequal power impulses, resulting in the vibration spoken of.

We quote from the specification:

" * * * The vice of this immediately successive firing order in one bank of cylinders is this: The next cylinder firing in the opposite bank has to pull against substantially double inertia effects where an ordinary manifold is used and that the cylinder is really starved.

"It is my belief that the reason * * this four throw 90 degree crankshaft is not used in eight cylinder motors of the V type is * * * that the manifolding problem has not been properly understood or corrected. The four throw 90 degree crankshaft has a much better running balance than the ordinary four throw 180 degree crankshaft now in use, but such better running balance of the four throw 90 degree shaft is more than offset by the unequal gas distribution when the ordinary manifolding is used. * * *

"I have remedied this condition by employing separate passageways from the fuel supply means. * * * Or separate carburetors may be used, as shown in Fig. 5, and a single manifold to connect a pair of cylinders at one end of one bank with a pair of cylinders at the other end of the other bank."

Claims 1 and 2 are printed.[1]

Appellee claimed that Goodrich was anticipated by Patent No. 1,051,866, Feb-

---

[1] "1. The combination with an internal combustion engine having two banks of cylinders arranged angularly about the crankshaft, some of the cylinders in a bank having immediately succeeding firing orders, of fuel mixing means, manifolding leading from the said mixing means to the cylinders and divided into passageways so that the end of a single passageway connects only cylinders having a non-immediately successive firing order.

"2. The combination with an internal combustion engine having two banks of cylinders arranged angularly about the crankshaft, each bank including a plurality of cylinders, with some of the cylinders in a bank, having immediately succeeding firing orders, of fuel supply means, manifolding reaching both banks of cylinders and arranged and divided so that there are passageways each of which leads to a plurality of cylinders in a bank but only the cylinders in such bank that have non-immediately successive firing orders."

ruary 4, 1913, to Delaunay-Belleville. This patent was for a "Multiple-Cylinder Explosion-Motor," and was designed to eliminate "simultaneous suction," during a fraction of a revolution, from two cylinders of a multiple cylinder explosion motor with a single carburetor; quoting from the specification:

"In a multiple-cylinder explosion motor with a single carburetor when the suctions of two cylinders take place simultaneously during a fraction of a revolution, trouble arises in the flowing of the gases, the suction of one of the cylinders opposing the suction of the other during the period at which suction takes place simultaneously and the result of this is to reduce the efficiency of one or other of these cylinders or of both of them. The suction of a cylinder lasts practically during a stroke, that is to say while the motor effects a half-revolution so that two suction periods are simultaneous when the angular interval between the commencements of these two suction phases is less than 180 degrees.

"The present invention has for its object to obviate this defect.

"It consists in feeding fuel to the motor by means of two or more separate carburetors, each of them feeding a certain number of cylinders by means of independent piping, these cylinders being selected in such a manner that the suction periods of any two of these cylinders are not simultaneous or even partially and consequently the explosions of these cylinders succeed each other at angular intervals of at least 180 degrees."

We concur in the finding of the District Judge that Delaunay-Belleville did not anticipate Goodrich. Delaunay-Belleville was not dealing with "two banks of cylinders ranged angularly to the crankshaft." His problem was to correct "simultaneous suction," involving two cylinders, and not "double inertia" involving three.

The issuance of the Goodrich patent created a presumption of validity which in our opinion appellee's proof has failed to overcome; but while Delaunay-Belleville does not clearly anticipate Goodrich, we think it does conclusively show that Goodrich was not a pioneer in the matter of equable fuel distribution to multi-cylinder engines. He disclosed no generic invention and we do not think that he may insist upon a broad or generic construction of the language of his claims. See Directoplate Corp. v. Donaldson Lithographing Co., 6 Cir., 51 F.2d 199, 200, 202.

The accused structure, that is for the Ford 1934 V-8, consisted of two vertical pipes from the carburetor, each of which connected entirely independent horizontal distributing pipes running with the long axis of the motor. These horizontal pipes were superimposed. In Exhibits 15a and 15b, it appears that the upper one fed cylinders 2, 3, 5, 8 and the lower, cylinders 1, 4, 6, 7. These horizontal pipes were straight except at their midpoints, where there was a slight jog in each, to accommodate the vertical feed pipes coming down side by side from the carburetor. The feed pipe to cylinders 2 and 3 from the upper horizontal pipe and to cylinders 6 and 7 from the lower, branched off at right angles from the horizontal pipes and then descended by abrupt curves to the individual cylinders. The feed pipes to the end cylinders, 5 and 8 from the upper horizontal pipe, and 1 and 4 from the lower, were joined to the ends of the horizontal pipes in abrupt curves, which were barely short of right angles, and then dropped in sharp curves to their respective cylinders.

By this arrangement, the Ford firing order of 1, 5, 4, 8, 6, 3, 7, 2 was broken up between the two feeding systems so that the evil due to successive firing by cylinders in the same bank was avoided. This can be visualized by rewriting the firing order with the numbers representing the cylinders fed by the upper piping set above those representing the lower, thus:

$$5 - - 8 - - 3 - - 2$$
$$1 - - 4 - - 6 - - 7$$

This manifolding made possible an alternation in drawing upon the upper and lower feed pipes, much like the bank-to-bank alternation in the V-8 motor using a flat crankshaft.

Thus we see, by providing two vertical, and two horizontal, feed pipes, each serving separately four cylinders, appellee escaped the supposed fault of "double inertia." Whether this escape was the purpose of its dual feed system, or simply a consequence, is not entirely clear.

The District Court invoked a literal reading of appellant's claims and held that there was no infringement. This was

sound. As applicable here, "that which is not literally within the claim does not infringe."

 Claim 3 is not discussed in the briefs but the gist of claims 1 and 2 lies in their description of manifolding. From our delineation of the horizontal passageways of appellee's manifold, with the conduits distinctly branching therefrom to the individual cylinders, it is clear that appellee's structure does not have passageways such that "the end of a single passageway connects only cylinders having a non-immediately successive firing order." There is no "siamesing" or merging of passageway into feed pipes in appellee. The cylinder feeds are individual and well defined.

Similarly, claim 2, which calls for "passageways each of which leads to a plurality of cylinders * * * ," cannot be stretched to cover the severable sub-branching arrangement of appellee.

The decree is affirmed.