## METAL CUTTING TOOL SERVICE v. NATIONAL TOOL CO.

### No. 7742.

Circuit Court of Appeals, Sixth Circuit.

May 4, 1939.

582

William Edward Hann, of Detroit, Mich. (J. King Harness, Arthur W. Dickey, and John A. Blair, all of Detroit, Mich., and John W. Meyer, of Cleveland, Ohio, on the brief), for appellant.

William R. Day, of Cleveland, Ohio (Fay, Oberlin & Fay, John F. Oberlin, and William R. Day, all of Cleveland, Ohio, on the brief), for appellee.

Before HICKS, SIMONS, and HAMILTON, Circuit Judges.

SIMONS, Circuit Judge.

The bill filed by the appellant charging infringement of patent No. 1,463,473 to Lapointe for a broaching tool was dismissed in the court below because of non-infringement. Decision in respect to certain assailed structures of the defendant was based upon a construction giving limited scope to the claims in suit, and in respect to another structure it was held that the appellant having induced its manufacture was not entitled to equitable relief.

A broaching tool or broach is used in cutting and shaping metal parts, and is generally provided with a plurality of teeth which pass over the work in succession, each tooth removing additional metal over that removed by the preceding tooth. It differs from a saw in that the work and tool are never fed toward each other perpendicularly to the plane of movement, and in that the broaching operation is completed by a single pass of the tool over the work in a fixed path parallel to the surface to be cut. Broach teeth are made of the width of the surface to be finished and can be designed to finish surfaces of any contour. In the case of internal broaches for finishing circular or square holes in metal, the cutting edges extend entirely around the tool, which is designed to the shape and size of the surface to be finished.

In conventional broaches of the prior art a number of teeth employed in the cutting operation are of progressively increasing height so that as the broach moves parallel to the surface to be cut each succeeding tooth removes an additional layer of material. The remaining teeth of the broach are of equal height and are called finishing teeth. Of these only the first will perform any substantial cutting, the rest of them performing only a smoothing or burnishing operation. All of the teeth in this type of broach have a top clearance or rake, that is, the top surfaces slope rearwardly from the cutting edge, the conventional clearance angle being from one and one-half to three degrees. It is without dispute that teeth without such clearance will not cut. After a broach of this type has been dulled by use it is sharpened by grinding back the forward face of each tooth. This grinding reduces the height of the tooth because of the rake. When the last cutting tooth has been sharpened it will no longer cut to size, but since a plurality of finishing teeth are provided, and all are sharpened at the same time, the next succeeding tooth becames a cutting tooth, and this operation is repeated until the final tooth on the broach becomes dull, when the tool is no longer useful to cut to size. While in surface work a broach with teeth reduced by such successive sharpenings may still be used, there will be required a precise adjustment of the broach to the work, which greatly reduces the value of this type of broach for surface work.

The objective of the Lapointe invention was to prolong the life of broaches by providing a tool that could be more often sharpened than those of the prior art without becoming reduced in size. The invention involved a change in the shape of the top of the finishing teeth, and is said to be based upon the discovery that teeth which perform no cutting need not be provided with rake or clearance entirely across the top of the tooth, since such teeth merely follow through, so Lapointe provided flat lands of substantial width extending rearwardly from the cutting edge and parallel to the direction of movement of the broach. These permit a sharpening of the finishing teeth by grinding away their front faces without a consequent reduction in size or height until they become successively cutting teeth and permit repeated sharpening of all of the teeth at the same time. So the period of usefulness for a broach with teeth having flat lands was greatly increased over broaches of the prior art.

The Lapointe broaches have come into wide commercial use, and it is said in the record without contradiction that approximately 90% of the broaches now in use embody the features shown in the patent, and that the invention has increased the working life of a broaching tool from four to eight times that of broaches made prior thereto.

Lapointe was allowed four claims, of which three are printed in the margin.[1] The only recorded prior art advanced by the defendant is a patent to Heinkel, No. 1,287,686, and a publication in the Machinery Handbook of 1915. The court below found no anticipation in either disclosure, and we agree. The Heinkel tool is one rotatably driven like a reamer, whereby the same cutting edge makes repeated cuts in the work, and it has no finishing teeth or any teeth of the same size or diameter. Nor is there any suggestion therein of lands of varying width upon teeth the sharpening of which will not reduce the diameter of the tool. The Machinery Handbook article describes no tool with teeth upon which lands are left after the hardening process or after the backing off of their tops.

█ It is urged, however, that since in the course of manufacture of prior art broaches lands are provided upon the teeth, and since in order to make them operative and useful they are then backed off or relieved, thereby providing an operative and useful tool capable of cutting metal, so if during manufacture the first of the series is backed off the basic feature of the patent in suit is then produced, and the patent therefore merely appropriates this old unfinished device of the prior art as a new and complete article. Insofar as this contention suggests the application of the principle that one who but finds a new use for an old article may not thereon secure a valid patent, Weir Frog Co. v. Porter, 6 Cir., 206 F. 670; Grand Rapids Refrigerator Co. v. Stevens, 6 Cir., 27 F.2d 243; Page Steel & Wire Co. v. Smith Bros. Hardware Co., 6 Cir., 64 F.2d 512, it is sufficient answer to say that there is no evidence in the record that such partly finished broach was ever put to use, and the controlling principle is that novelty is not negatived by any prior accidental occurrence or production the character and function of which was not recognized until later than the date of the patented invention. 1 Walker, 6th Ed. 130, and cases there cited.

█ We think Lapointe made a useful and important improvement in broaching tools for accurate and economical machining of metal parts; that what he did was an exercise of the inventive faculty rather than mere mechanical skill; that he is entitled to the inventor's reward, and the claims of his patent are valid.

█ Of the broaches charged to infringe, some were surface broaches and others internal broaches. The three accused surface broaches are provided with a plurality of finishing teeth of uniform size which have lands of varying width and of progressively increasing width. Each of them falls within the terms of claims 1 and 2 of the patent. The trial court found that they do not constitute infringement because the invention has no utility when applied to a flat or surface broach and must therefore be limited to internal broaches. We think this was error. While the specification and drawings of the patent describe and depict internal broaches of cylindrical form, the claims are not limited to this type, and the record fairly establishes the utility of a surface broach responding to the teachings of the patent, even though their greater contribution is in the field of internal broaches. In the use of a surface broach of the prior art when its teeth by successive sharpenings have been so reduced in height that they will no longer cut to size it is possible to readjust its positioning to the surface to be planed so that it will still be useful. But it is clear that this is a delicate and time consuming process, and that the longer life of the patented broach was a very useful contribution to the mass production industries even in surface finishing. The challenge to its utility in surface planing is not clear. The confusion in the testi-

---

1. A device of the class described, having a plurality of cutting members of uniform size and provided with lands of varying width.

2. A device of the class described, having a plurality of cutting members of uniform size and each of which is provided with a land wider than that on the preceding cutting member.

3. A device of the class described, having a plurality of finishing cutting members of equal diameter provided with lands of varying widths.

mony of the defendant's witnesses indicates that they did not distinguish clearly between the functions of cutting and finishing teeth. The accused surface broaches infringe claims 1 and 2 of the patent.

 With regard to the defendant's internal broaches, however, it appears that they were provided with finishing teeth having lands of equal width. They do not infringe. The appellant draws the inference that so provided they were but partly completed, and that it was intended that the lands be reduced to lands of varying width either by the defendant or its customers. There is no evidence, however, of such intention, and the burden of proof to establish infringement by the internal broaches is not sustained. The contention that the assailed internal broaches are, notwithstanding their lands of uniform width, infringement of the claims on the ground of equivalency, must also be rejected. The claims are limited to broaches with teeth having lands of varying width or of progressively increasing widths. The monopoly granted to the inventor is defined by the claims of his patent. It is familiar doctrine that if the invention is broader than the claims, what is left unclaimed is dedicated to the public. The court was not in error in limiting the scope of the claims to broaches with teeth having lands of varying widths.

 One question remains to be decided. One of the surface broaches charged to infringe was ordered from the defendant by a stranger to the proceedings. The defendant filled the order. Two months later the present suit for infringement was brought and at the trial the broach was produced by the plaintiff apparently unused and without explanation of the manner in which it was obtained. From this sequence of events, and without any charge of inequity by the defendant, the court drew the inference that the plaintiff had induced the defendant to commit a tort, that by reason of such inducement the plaintiff came into equity with unclean hands, and so was entitled to no relief. This conclusion is not to be sustained. Not having been charged with any breach of good faith the plaintiff had no opportunity to rebut the inference drawn by the court. Even so it is equally reasonable inference that the exhibit came into the plaintiff's hands innocently, and certainly the plaintiff is not to be denied the benefit of the presump-

tion of bona fides that normally attends the actions of men whose good faith is not otherwise impeached. Insofar as the alleged wrongdoing of the appellant approximates entrapment, condemned upon considerations of public policy in the enforcement of the criminal law, it has never been thought that the mere furnishing of an opportunity to a suspected wrongdoer to give proof of his misconduct, where there has been no effort to override the will or a natural inclination to conform to accepted standards of conduct, constitutes entrapment. Billingsley v. United States, 6 Cir., 274 F. 86, 89; Browne v. United States, 6 Cir., 290 F. 870, 874.

The decree is reversed. The usual relief by way of injunction and accounting will be granted with respect to those structures of the defendant held to infringe.