## BALDWIN RUBBER CO. v. PAINE & WILLIAMS CO.

### No. 8124.

Circuit Court of Appeals, Sixth Circuit.

Nov. 15, 1939.

George I. Haight, of Chicago, Ill. (Butzel, Eaman, Long, Gust & Bills and Whittemore, Hulbert & Belknap, all of Detroit, Mich., George I. Haight, of Chicago, Ill., and Rockwell T. Gust and Clarence B. Zewadski, both of Detroit, Mich., on the brief), for appellant.

John F. Oberlin and Howard F. Burns, both of Cleveland, Ohio (Beaumont, Smith & Harris, of Detroit, Mich., and Jno. F. Oberlin, Howard F. Burns, and John Adams, all of Cleveland, Ohio, on the brief), for appellee.

Before SIMONS, ALLEN, and HAMILTON, Circuit Judges.

HAMILTON, Circuit Judge.

The appellant-licensee, the Baldwin Rubber Company, appeals from a judgment of $101,491.54, in favor of appellee-licensor, The Paine & Williams Company, for royalties alleged to be due on the manufacture of automobile rubber floor covering and methods of, and apparatus for, making such coverings. The issues are whether the product manufactured and sold by appellee was covered by the license and whether the license is void because of price fixing.

On March 18, 1933, William S. Vrooman filed in the Patent Office an application, No. 661,453, for United States Letters Patent on alleged new and useful improvements in rubber floor coverings and methods of, and apparatus for, making same and on March 16, 1933, assigned his entire right, title and interest therein and any letters patent granted pursuant thereto to the appellee.

On June 10, 1933, appellee granted to the appellant a non-exclusive license to use the Vrooman invention to the end of the term of any letters patent granted pursuant to his application or any division, renewal, re-issue or extension of it. The license was terminable in the event the application was finally rejected or at any time after one year on six months' notice in writing to the licensor.

It was granted on the express condition that the minimum sale price of automobile floor mats manufactured pursuant to it should be not less than those fixed from time to time by the licensor.

Appellant, for many years, had been engaged in the manufacture of automobile rubber floor mats simultaneously molded and vulcanized from raw rubber. In 1932, several automobile manufacturers lowered the floors of their cars causing some of the mechanical parts to project above the floor level, which necessitated the use of contoured floor coverings and a different shaped matrix or mold for making them.

Rubber floor coverings had been manufactured previously by placing raw rubber in a matrix to which heat and pressure were simultaneously applied so that the rubber vulcanized and became permanently shaped.

Early in December 1932, appellant constructed experimental molds of heavy steel

designed to produce a mat which would fit the protuberances in the floors of the new cars, which method proved satisfactory but which was costly in construction and expensive in operation. W. S. Vrooman, an employee of appellee, who was experienced in the manufacture of rubber floor mats, prior to 1933, conceived the idea of an apparatus for making inexpensive contoured mats. He first made a flat rubber mat of the desired outline with conventional molding dies which simultaneously molded and vulcanized it to a high degree of permanent set. After this was done the mat was removed from the mold and while at a temperature of about 140° Fahr., was placed on another apparatus containing a base support made of steel or other metal having an aperture in communication with an inlet tube threadedly secured to the base plate. Mounted on this plate and secured thereto by bars and bolts, was a diaphragm of high quality gum rubber with a low degree of permanent set. These bars engaged the marginal portions of the diaphragm and provided an airtight seal between it and the base plate.

The apparatus also had a die block made of wood or other easily fashioned material, having a cavity or recess of a size substantially larger than that of the protuberance or hump which it was desired to form in the mat.

The hot rubber mat was placed on the rubber diaphragm, and the die block was placed on the mat with the cavity over the portion in which the protuberance or hump was to be formed. A plate similar to the base plate was then put over the die block and clamp members of such size as to be easily slipped in position by hand were applied with the jaws loosely holding the upper and lower plates.

While the mat was thus secured in position, air or steam under high pressure was introduced through the tube between the base plate and the diaphragm, which pressure raised the diaphragm and the mat so as to bring its flat portions into close contact with the corresponding portion of the block. The friction between the lower surface of the die block and the portion of the mat thus contacted effectively locked them together and prevented subsequent stretching or distortion. The diaphragm and the part of the mat beneath the cavity were stretched upwardly to form a protuberance or hump considerably larger than necessary. The diaphragm served as a support or backing for the mat during the formation of the protuberance and also caused air or steam pressure to be more uniformly distributed over the mat than if either were applied directly to the mat without using the diaphragm. .

When the air or steam pressure was cut off, that part of the diaphragm outside of the cavity resumed its original flat condition but that portion within it, on account of its high degree of permanent set, would not return to its original position but to an intermediate one, which was permanent and which resulted in a protuberance of the desired size and shape, which depended on the size and shape of the cavity in the die block. Vrooman pointed out in his application that his method could also be practiced with rubber mats in a normal unheated condition and that it provided for the use of existing mat molding equipment with the addition of a simple and inexpensive apparatus for forming a protuberance in the completed mat. He also pointed out that in the prior art protuberances had been formed in mats simultaneously with molding but this method required new molds made of steel or other heat-resisting material which was more expensive than using the wooden die block which he proposed.

Vrooman made eighteen claims in his application and on July 13, 1933, the patent office required division between the method, apparatus and article because some other apparatus could be used to perform the process and because the hump could be made by the usual molding operation in suitably-shaped molds. All of the original claims stated in the application were rejected in the patent office and amended claims 19, 20 and 21 were allowed by the examiner September 12, 1935.

Claim 21 is typical and is as follows: "The method of forming a protuberance in an article formed of vulcanized rubber having a high degree of permanent set which comprises confining between two plane surfaces all but a localized portion of said article from which the protuberance is to be formed, and applying pressure uniformly to said localized portion of the article, said pressure being in such direction and of such magnitude as to cause a bulging of such portion outwardly from the general plane of the article, and maintaining said pressure for a length of time sufficient to produce a permanent set in said bulged-out portion."

Vrooman's application was decided by the Patent Office to be an interference with the patent theretofore issued to Blair, et al., No. 2,032,832, which proceeding was still pending at the time of the trial.

After appellant had experimented with heavy, rigid molds it tried a lighter one, in which it made a mat in two pieces, one piece flat with a hole in it, the other contoured, and attached the two together.

Vrooman left the employment of appellee and entered the employment of appellant in September 1933 and in the Spring of 1934 appellant put into use an apparatus and method for making floor mats by arranging molds in a vertical series of eight, each duplicating the other. This appliance was designed for the simultaneous manufacture of a plurality of mats. It was a complex structure, the sectional molds and method of manufacture only being material to this case. Each mold or section in each deck was comprised of a rectangular frame reinforced at the corners by gusset plates, the upper and lower sides of the sections being closed by upper and lower rubber diaphragms, the edges of which were securely screwed to the frame. The purpose of the diaphragms was to provide a vacuum into which fluid under pressure could be introduced which would expand them upwardly and downwardly.

A thin metallic plate, secured to the frame of the deck by bolts, covered the upper diaphragm. A hard rubber mold form was disposed on the upper surface of this plate, secured thereto by screws, and on the edge of its upper surface a metal cut-off was placed in order to delineate the outer boundary of the mat. The operator, with his hands, pressed a previously lubricated, uncured rubber compound into the molds which were hot and electrically opened, the heat causing the compound to flow more freely. The presses were then electrically closed and locked and steam under pressure introduced to the rear of both mold members causing the lower diaphragm of each deck to be pressed against the mat on the deck below it and the upper diaphragm in the latter to be forced upwardly, which produced a balancing pressure, the lower diaphragm pressing the mat while the upper diaphragm prevented a downward movement. Because of the construction in series of the appellant's apparatus, the upper crown plate and deck had only a lower diaphragm and the lower plate and deck only an upper one. If constructed singly, two diaphragms would be necessary in each. Appellant employed a flexible rubber diaphragm and used uncured rubber compound vulcanizing and contouring it simultaneously into a mat.

The inventor of a new and useful improvement has no exclusive right to it until he obtains a patent. This right is created by the patent, but the discoverer is vested by law with an inchoate right to its exclusive use which he may perfect and make absolute by proceeding in the manner which the law requires and after an inventor files his application pursuant to the statute he may transfer all of this right by assignment or a part of it by license. Gayler v. Wilder, 10 How. 477, 51 U.S. 477, 492, 13 L.Ed. 504.

In the case here Vrooman assigned to appellee in its inchoate state, his alleged discovery in its entirety. Brush Electric Company v. California Electric Light Company, 9 Cir., 52 F. 945, and it appears from the language of the license here in question that it was intended by the parties to operate upon whatever title appellee had acquired from Vrooman, which he then had a lawful right to obtain in the form of a patent, as well as the imperfect and inchoate interest he actually possessed.

The construction of a license in writing depends upon the same general rules as the construction of other written contracts. 1 Walker, 6th Ed. 354. The rule is applicable to the license in question that it must be interpreted reasonably to give effect to the plain intention of the parties as adduced from the whole agreement, its nature, their situation and the objects they had in view in making it. Burdell v. Denig, 92 U.S. 716, 722, 23 L.Ed. 764. Terms may be implied in a contract, not because they are reasonable, but because they are necessarily involved in the contractual relationship so that the parties must have intended but failed to specifically include them because of their obviousness. Where, from the nature of a contract and the circumstances under which made, it is apparent the parties must have proceeded on the basis that certain conditions existed, without which its performance would be unnecessary, the existence of such conditions will be regarded as implied terms of the obligation. Sacramento Navigation Company v. Salz, 273 U.S. 326, 329, 47 S.Ct. 368, 71 L.Ed. 663; Wheeling

& L. E. R. Co. v. Carpenter, 6 Cir., 218 F. 273.

Considering the language of the license here in question in the light of all the circumstances and purposes surrounding its execution, it is manifest that the licensor intended to convey and the licensee intended to accept either a process or apparatus or both for the manufacture of contoured automobile mats of which appellee's assignor was the discoverer. There was excluded from the minds of the parties in making the contract all earlier known conceptions of the process or apparatus and all improvements readily apparent to those skilled in the art.

In view of the patents offered in evidence such as Hellweg, No. 1,577,526; Ellis, No. 263,744; Egerton, No. 1,475,-623; and Lanhoffer, Nos. 1,209,308 and 1,260,002, and the proceedings in the patent office as shown by the file wrapper, the process and apparatus described in Vrooman's application are neither basic nor pioneer, but constitute only an application for a patent on a combination of elements in prior use. The claims are not entitled to a broad and liberal construction, but on the contrary, the range of equivalents allowed to the combination must be so narrow as to include nothing which is not substantially identical with the means used by the applicant patentee.

The Court will include within the license only such process or apparatus as is the substantial equivalent of the process or apparatus described in the claims of the application and will exclude the use of other known means, although equivalent in function. Burr v. Duryee, 1 Wall. 531, 68 U.S. 531, 573, 17 L.Ed. 650; Metal Cutting Tool Service v. National Tool Company, 6 Cir., 103 F.2d 581; Goodrich v. Ford Motor Company, 6 Cir., 97 F.2d 427; Winget Kickernick Co. v. Sil-O-Ette Underwear Corporation, 2 Cir., 89 F.2d 635.

The amended article claims appear to cover every shaped rubber automobile mat in which there is a protuberance, to accommodate the mat to structural irregularities of the automobile floor without regard to the method by which, or the apparatus through which, the mat is shaped. Passing the precise question as to whether the licensee is bound by claims which had no existence and were not in the application when the license agreement was executed, it would seem to us that since the licensee is not estopped from considering the scope of patent claims in the light of prior art, and when so considered claims may be so narrowly construed as to fail to cover the licensee's articles, practices or machine, it must follow that when claims are so broad as to comprehend all prior art the licensee who contracted for the use of an invention, and not for art in which the licensor had no monopoly, is not bound and that this does no violence to the rule of estoppel which forecloses challenge by the licensee to the validity of a patent. If this were not so, a licensor, in a license granted upon an application, might include in amended claims every article manufactured and every practice or machine employed by the licensee, whether germane to the invention or not. Westinghouse Electric & Manufacturing Co. v. Formica Insulation Company, 266 U.S. 342, 351, 45 S.Ct. 117, 69 L.Ed. 316; Noonan v. Chester Park Athletic Club Co., 6 Cir., 99 F. 90.

There are essential differences between the apparatus and the process of manufacture used by the appellant and those described by appellee's assignor in his application. Vrooman proposed to vulcanize and shape in the conventional type of mold a flat mat and then to place it in a high quality rubber diaphragm press, with a die block over it in order to stretch it in the form of the desired protuberance or hump by breaking down the resiliency of the rubber at that point.

Appellant used an uncured rubber compound placed in molds with diaphragms as in Vrooman's but without die blocks, and without using a separate apparatus for molding or vulcanizing, the vulcanizing and contouring being simultaneous and without breaking down the resiliency of the rubber.

Its process and apparatus contemplated a continuous operation from the shaping and vulcanizing of the raw material to the completion of the finished mat. It used a series of molds to shape and vulcanize simultaneously and its apparatus was capable of making eight mats with one operation. The essential actuating elements of Vrooman's original discovery have been omitted from appellant's process and a wholly different apparatus, machine or instrumentality substituted.

In view of the prior art when explored for the purpose of ascertaining the

breadth of the claims in the application of the licensor's assignor, we are of the opinion that appellant-licensee was using neither an apparatus nor process which was identical with or equivalent to the process or apparatus covered by the license herein.

Since we have concluded that the mats manufactured and sold by appellant are not within the license, we find it unnecessary to consider appellant's other assignments of error.

We find no substantial evidence in the record to support the judgment of the lower court. It therefore follows that its judgment is reversed and the cause remanded for proceedings in accordance with this opinion.