### ANDRUS et al. v. WHITMAN.

### ANDRUS et al. v. WENZEL et al.

### BESSER MFG. CO. v. WHITMAN.
### Civ. Nos. 749, 750, 763.

United States District Court
E. D. Michigan, N. D.
June 28, 1950.

On Rehearing Oct. 10, 1950.

384

I. Joseph Farley, Farley, Forster & Farley, Detroit, Mich., for plaintiffs.

Frank E. Liverance, Jr., Liverance & Van Antwerp, Grand Rapids, Mich., for defendants.

PICARD, District Judge.

Plaintiffs Andrus and Gelbman are co-owners of patents No. 2,275,676 (1942) and 2,366,780 (1945). The first is an apparatus, and the second a method patent for the manufacture of concrete building blocks. Plaintiff, Besser Manufacturing Co., licensee under both Andrus-Gelbman patents, is the owner of apparatus patent No. 2,106,329 (1938), known and referred to herein as the Scott patent. There are three separate suits that have been consolidated for trial. Originally, John A. Whitman, Midland, Michigan, was defendant in two actions—749 involving patent 2,275,676 and 2,366,780, and 763 involving patent 2,106,329. Defendants Wenzel and Geotsch, Rogers City, Michigan, are in civil action No. 750 involving patents 2,275,676 and 2,366,780. The Lith–I Bar Company, a Michigan Corporation, located in Holland, Michigan, manufacturer of the machines alleged to infringe the patents involved, assumed defense of all actions and has been made a party defendant.

The questions at issue in each case go to both the validity and infringement of the patent claims.

### Findings of Facts

For over thirty years concrete blocks were made by pouring the usual dampened mix into a mold, then tamping the mix to compact it, adding more material, more tamping, etc., so that as many as five separate charging and tamping operations were required for the standard 8-inch block. This method was not only time consuming and costly, but produced a block that tended to have lines of cleavage formed between each added layer of material. The patented plain pallet machines of Besser automatically do what was formerly done by hand, much quicker, much more efficiently, produce over 6000 blocks[1] a day compared to one or two hundred in the old

days, at less cost and a resultant block that is uniform throughout.

In addition to the tamping method there is now vibration of the mold either while the material is being run into the mold or afterwards, followed by tamping or the application of pressure or both until the block becomes sufficiently compact and cohesive so as to be subject to immediate ejection without deforming in any way.

The Besser machine incorporates at least parts of the three patents.

First, Scott, in which the mold holding the mix is suspended from the frame and is then vibrated at high speed with no other part of the machine being noticeably affected by the vibration.

The claims of this patent also include an ejection mechanism.

Then the machine uses the Gelbman apparatus patent which provides for a feed drawer running from a large supply hopper on a trackway over the mold with the feed drawer kept out of vibrational contact with the mold at all times and so constructed that there is a minimum of vibration conducted to the mix in the main hopper.

And third, it uses the Gelbman method patent, providing for the feed box moving over the mold, pouring in the mix as it goes over the mold and while the mold is being vibrated, withdrawal of the feed box and then applying pressure during continued mold vibration.

We will discuss each patent and the objections including the prior art and infringement with reference to the law as it applies to each.

### The Scott Patent

#### (2,106,329)

The Scott apparatus patent was granted Jan. 25, 1938 on an application filed almost eleven years before. Its claimed invention

[1]. The leading Besser machines now make 3 blocks on one pallet each cycle, turns slightly more than 4 cycles per minute, or 12 and a fraction blocks. Hence 720 plus per hour or 5760 plus blocks per 8 hour day. Besser also makes 1 and 2 blocks per cycle machines. There are some tamping machines, however, that turn out about 3600 blocks per day, and the Stearns cord pallet machine that can make about 4800 or 5000 blocks per day, 3 at a time.

lies in the fact that it describes a form or mold holding the mix freed from the rest of the machine during vibration by incorporating resilient supports between the mold and frame of the machine, imparting a high frequency orbital form of vibration to the mold, and producing and concentrating such vibration in the mold by the direct bearing attachment of a high speed eccentrically weighed orbital vibration producing shaft on a remote flexible drive. It also includes an ejection mechanism mounted on the frame of the machine but the machine is so constructed that the mold remains perfectly free to vibrate and the concrete block is ejected after the consolidation thereof is completed.

The plaintiff, Besser Manufacturing Co., alleges that its claims Nos. 1 and 6 are infringed by defendants' machine.

Each Scott patent claim is in two parts—suspension of the vibrating mold, and ejection of the block. Claim 1 specifically states that the mold shall be suspended by "springs." That claim of itself does not cover vibrating of the mold free from the rest of the machine. But claim 6 has such a provision and claim 6 does not limit the means for suspension of the mold to "springs." Claim 6 uses the words "resilient means" which, of course, is much broader.

### Validity

On the question of validity defendants state that the Taylor 899,441 patent, an ore washing device, resiliently mounted and vibrated, anticipated the independent vibration of the concrete block mold as did Bonnet 1,461,860, Jackson 1,787,449, McWain 1,574,985 and Flam 1,806,620. It is also defendants' contention that the ejection part of both claims 1 and 6 is clearly anticipated by Bonnet, supra, and that the Scott invention is but an aggregation of old means anticipated by the prior art. Defendants claim they use the Ferguson 1,214,530 theory of ejection.

While initially one might be more impressed by the Jackson patent, which provides for vibrating of the outside wall of a frame for building a concrete wall, as anticipation in the prior art, nevertheless, it is the Tay-

lor resiliently mounted sieve patent that presents defendants with their most potent argument. The Taylor patent was merely a screen that separated the smaller particles of ore from the larger. There is nothing mentioned about a mold in the Taylor patent but when this matter was before the patent office it was held that substituting a "mold" for a "washing sieve" would involve "no invention," and standing independently, that particular claim in the Scott patent was rejected. Cuno Engineering Corp. v. Automatic Devices Corp., 314 U.S. 84, 62 S.Ct. 37, 86 L.Ed. 58. The inventor of the Scott patent did not appeal this holding. See 48 C.J.1929, Sec. 357, p. 231.

Plaintiffs insist, however, that Scott is a combination consisting of two parts, featuring not only a resiliently mounted mold but also the means of ejection and the high speed with which the mold is vibrated. The means of ejection in the Scott patent, as depicted in the patent drawing, provides for the pallet and the finished concrete block being pushed up out of the mold. So does the Bonnet patent. Naturally there must be some method of getting the block out of the machine and the net result of both Bonnet and Scott is the same as in all concrete block making machines—a concrete block ready for the market.

### Infringement

Claim 1 of the Scott patent specifically limits suspension of the mold to "springs." The defendants use "rubber."

However, that same distinction cannot be made when claim 6 of the Scott patent is considered because admittedly the mechanism of suspension in claim 6 is not limited to springs but includes all "resilient means." Nevertheless there are several reasons why defendants' machine does not infringe either 1 or 6 of the Scott claims. In the Scott patent the mold does vibrate substantially independently of the frame. That is its main feature. The mold is supported by springs (1) or other "resilient means" (6) and the pallet goes inside the mold with no engagement of the mold while vibrating by any part of the remaining structure of

the machine. That was Scott's claim when he got his patent.

But in defendants' machine there is a piston cylinder apparatus which moves upward to force the pallet against the underside of the mold and which pallet covers the entire bottom of the mold to close it. While defendants' mold rests on the rubber block when not in operation, as the machine operates the mold is supported on the pallet forced upwardly by a table at the end of a telescoping piston cylinder structure and maintains this position while the mold is being vibrated. Unlike Scott that part of the machine fastened to the floor vibrates with the mold which therefore does not vibrate independently. Furthermore, the mold is not supported solely by springs or rubber, independent of the frame as in Scott; the pallet is not inside the mold but against the bottom and in ejection the pallet carrying the cylinder drops down as the piston telescopes inside the cylinder permitting the block to be removed, substantially as in Ferguson.

So the essential requisites of the Scott apparatus that the mold should be carried by "springs" or "other resilient means" at all times and particularly while the mold is vibrating is not present in defendants' machine, and defendants' mechanism of ejection is different in structure and principal.

### Conclusions of Law

It is our conclusion, therefore, on the question of validity that with the resiliency feature eliminated the Scott patent is not a combination of old devices to obtain something new, but as charged by defendants, Scott merely added one function to another to get an old result, and as stated in Dow Chemical Co. v. Halliburton Oil Well Cementing Co., 324 U.S. 320, 65 S.Ct. 647, 650, 89 L.Ed. 973—"He who is merely the first to utilize the existing fund of public knowledge for new and obvious purposes must be satisfied with whatever fame, personal satisfaction or commercial success he may be able to achieve. Patent monopolies, with all their significant economic and social consequences, are not reserved for those who contribute so insubstantially to that fund of public knowledge." See also Office Specialty Manufacturing Co. v. Fenton Metallic Manufacturing Co., 174 U.S. 492, 19 S.Ct. 641, 643, 43 L.Ed. 1058— "Where a combination of old devices produces a new result, such combination is doubtless patentable; but where the combination is not only of old elements, but of old results, and no new function is evolved from such combination, it falls within the rulings of this court (citing several cases)." A combination of old elements in order to be patentable must produce by their joint action a novel and useful result. Grinnell Washing Mach. Co. v. E. E. Johnson Co., 247 U.S. 426, 38 S.Ct. 547, 62 L.Ed. 1196.

And Osgood Dredge Co. v. Metropolitan Dredging Co., 1 Cir., 75 F. 670, 672, where the court said: "It is a commonly accepted rule of the law of patents that the inventive idea is not ordinarily present in the conception of a combination which merely brings together two or more functions, to be availed of independently of each other. The mechanism which accomplishes such a result and no more is ordinarily spoken of as a mere aggregation." Also Ranco, Inc. v. Gwynn, 6 Cir., 128 F. 2d 437, 443—"mere aggregation of several results, each the complete product of one of the combined elements" is not patentable.

On infringement we follow Holtzer-Cabot Electric Co. v. Standard Electric Time Co., 1 Cir., 111 F.2d 71, 73, where the court in effect states that if the device complained of is not the same thing described in the specification of the patentee, nor in substance the same thing, there is no infringement.

"To find infringement it must be demonstrated that substantially the same means are employed to accomplish the same result. * * *

"The language of claim 5 is clear and definite and describes means for preventing insertion of the plug when the switch is open. It is limited to the language employed."

Also National Hollow Brake-Beam Co. v. Interchangeable B. B. Co., 8 Cir., 106 F. 693.

We hold, therefore, that claims 1 and 6 of the Scott patent are invalid, but we go

further and hold that if these claims are to be held valid there is clearly no infringement by defendants as to either claim 1 or 6 because of the lack of suspension in the accused machine and the difference in the method of ejection.[1]

## The Gelbman Apparatus Patent (2,275,676)

We come then to the Gelbman apparatus patent, the basis of civil actions Nos. 749–750 which plaintiffs allege made a progressive contribution to the vibratory practice by providing an accurate feed mechanism isolated from the mold vibration and then applying pressure. (Claim 7 provides for pressure but is not at issue herein.) The Gelbman feed drawer, mounted on rollers, shuttles between a large supply hopper and the mold, the rollers traveling along a trackway and holding the feed drawer out of vibrational contact with the mold so that when the mold is vibrated there is—1, no transmission of consolidating vibration to the material in the main supply hopper; 2, avoidance of any damping of mold vibration; and 3, minimization of wear in the adjacent surfaces of the mold and feed drawer. One and two, however, are partially off-set by the fact that both the Besser and defendants' machines have "agitators" inside the feed box to break up any hardening that may take place either at the hopper or between the hopper and the mold.

In the Gelbman apparatus patent also, as the feed box moves over the mold or is superimposed over it, the mold becomes completely filled and packed with an accurately uniform charge, with whatever surplus there might be scraped off by the return movement of the feed drawer. Thus it is claimed there is accurate feed, combined with simultaneous vibrational compacting. Pressure is then exerted on the mix to complete the preliminary formation of the block, ready for final setting and hardening.

It is well to remember that neither Gelbman patents proposed a suspended mold although the Besser machine uses one because of its ownership of the Scott patent.

The main feature of the Gelbman apparatus patent lies in the fact that the vibration of the mold containing the mix takes place free and clear of the rest of the frame particularly of the feed box and that pressure is applied. The use of a hopper was not new. The use of a feed box was not new. The running of a feed box from hopper to another part of a machine has been anticipated in the prior art in any number of patents while tracks and rollers have been used many times in various functions. The only question here on validity is whether the complete disengagement of the feed box from the mold while the mold vibrates, shown by Gelbman, is anticipated by the Shinn patent, 2,036,367 as defendants contend.

The Shinn patent uses a number of molds supplied by a hopper feed drawer passing over the top and filling the molds as it moves along a track. Shinn provides for vibration of the molds and, under the claims, to some extent to the hopper feed box. So if the Shinn patent vibrates the molds separately and apart from the hopper feed box, then it is in anticipation of the Gelbman patent and part of the prior art. On this important point, according to the record, the expert witness for defendants agreed with the expert witness for plaintiffs that the hopper feed box of the Shinn patent would vibrate with the molds. Later defendants' expert, according to defendants' counsel, corrected that impression.

The court visited the plant of one defendant and saw the accused machine in operation. Undoubtedly when the machine is first constructed there is close vibration of the mold and feed box because of seepage and the two flat metal bars that are placed on top of the mold box making a contacting engagement with the feed drawer. But it was proved and not forcefully disputed that these metal bars become worn down quickly and when they do the feed box does not vibrate with the mold. The difference between the two machines was more theoretical than actual. In fact, in our presence, viewing the machine, and the witnesses practically admitting that this feature was

1. Ed. Note: But see Rehearing Opinion [p. 392 infra] as to validity.

then operating the same as plaintiff's machine, it was explained by defendants that the metal bars needed replacement. In other words, as we saw it, that part of the accused machine operated the same as the Gelbman apparatus patent part of the Besser machine.

## Conclusions of Law

Are the Gelbman apparatus claims valid?

We have read all the claims in the Shinn patent and while there is language in those claims that would indicate that whatever vibration took place in the hopper feed box had nothing to do with vibration in the mold, it is not made the special feature impressed by the Gelbman patent. The drawings indicate that the hopper feed box would vibrate with the mold.

Furthermore, the Shinn patent does not entirely remove the probability of the undesirable transmission of consolidating mold vibration to the material in the main supply hopper through an intermediate feed drawer. The hopper is the feed box. Practically all witnesses agreed that this separation was desirable and it is given special emphasis in the Gelbman apparatus patent. Nor would isolation of the mold vibration from that of the hopper feed box constitute sufficient disclosure to provide anticipation under the present law. See Cimiotti Unhairing Co. v. Comstock Unhairing Co., C.C., 115 F. 524; In re Martocello, 73 F.2d 635, 22 C.C.Pa., Patents, 739; Root Refining Co. v. Universal Oil Products Co., 3 Cir., 78 F.2d 991.

■ Then, too, when it comes to validity, we are confronted by the great weight of authority, to-wit, that there is a presumption in favor of the patentee's claims. Walker on Patents, Dellers Edition, Vol. 2, page 1273, section 276 reads: "A presumption of validity follows from the issuance of a patent, and the burden is on the person alleging invalidity to establish it * * *. The presumption can be overcome only by clear and satisfactory proof." See also Coffin v. Ogden, 18 Wall. 120, 85 U.S. 120, 124, 21 L.Ed. 821; United Shirt & Collar Co. v. Beattie, C.C., 138 F. 136; Modern Products Supply Co. v. Drachenberg, 6 Cir., 152 F.2d 203; Gates

Rubber Co. v. B. F. Goodrich Rubber Co., D.C., 45 F.2d 652.

This presumption was not overcome by any clear and satisfactory proof produced by defendants.

■ And on the question of infringement we follow the court in Sandusky Foundry & Machine Co. v. De Lavaud, 6 Cir., 274 F. 607, 610—"Where defendants manufacture a device capable of an infringing use and sell it with the intent that it shall be so used, they infringe the patent, even though their device is capable of a noninfringing use, and even though they go through the form of instructing that it shall be used in a noninfringing way." Also Corrugated Fiber Co. v. Paper Working Machines Co., D.C., 259 F. 283 at page 288—"It is no defense for the defendant to say that his structure was not intended to be so adjusted or to be so used as to infringe." And see Peerless Equipment Co. v. W. H. Miner, Inc., 7 Cir., 93 F.2d 98.

■ The Gelbman apparatus claims 1, 2, 3 and 4 are valid and are infringed by the accused defendants' machines.

## Gelbman Method Patent
### (2,366,780)

We come to the Gelbman method patent No. 2,366,780, against which defendants, to test validity, cite many patents as prior art but particularly Dahl No. 1,777,660 and Stockwell No. 384,295.

In the Gelbman method patent there is a combination of two features—(1) a vibrating mold receiving the mix while the feed box is passing over or is in contact with the mold (which latter means while the feed box is over the mold) and (2) the pressure head further compacting the mix while the mold is still vibrating and after the feed box has been removed.

Gelbman in its method patent application and hearings laid great stress on vibration of the mold while the mix is being poured and that pressure is then used on the over-filled vibrating mold, instead of tamping.

In considering the validity of the claims of this patent it may be well for us to

390

add at this time that we find little merit in defendants' argument that the two claims of the Gelbman method patent are but a description of the operation of Gelbman's apparatus patent No. 2,275,676. Without conceding the truth of that statement, we can see no objection to this, and particularly in this instance because the method claims were originally in the apparatus patent and later by separate application were made the objective of the method patent. And while there is "pressure" provided for in the apparatus patent, there is not, therein, such combining of the two features as in the claims of the method patent.

Plaintiffs enunciate their position in the following extract from page 15 of plaintiffs' reply brief—"the Board of Appeals in allowing the claims now in issue (that is 1 and 2 of the Gelbman method patent) specifically held that, while the vibration during feed step of the method is completely anticipated by the prior art, it proceeded to allow the claims on the ground that the combination of steps in the Gelbman method of vibration during feed with the subsequent direct compressing steps during continued mold vibration was not anticipated by the separate references to the individual steps relied upon by the Examiner." (Parenthesis ours.)

We have grave doubts as to whether joining the feeding of the mold while vibrating and then adding pressure also while the mold is vibrating is in truth a combination and not an aggregation. Practically all concrete block machine patents for years covered vibration of some kind, plus some force, either tamping or pressure to get the final product. But it cannot be denied that whether we call this a combination or aggregation, the Gelbman patents evidently added to concrete block making machines of the plain pallet type not only in the number of blocks that could be made by a single machine per day, but the strength and quality of the block was apparently much greater and better. For that reason, while it may appear, as argued by defendants, that all you finally get out of the Gelbman patented machine is a concrete block when you get through, here it is done quicker, automatically, on a scale and of a quality unknown to the trade before. That would be a combination and not aggregation.

Conceding, therefore, for the time being, that the Gelbman method claims are valid, we come to infringement and we immediately note that the offending machine does not operate in the same manner as that of Besser. The first feature insisted upon by Gelbman before the examiner and the Board of Appeals was vibration of the mold while the feed box was pouring in the mix. There is no vibration while the feed box is going over the mold to help in compacting or chemical reaction, (if there is any chemical reaction) in defendants' machine. The second feature was the applying of pressure to the mix in the mold during vibration after the feed box had been removed. Plaintiffs differentiated between "pressure" and "tamping" when before the patent office and before the court. Pressure during vibrating, following vibration of the mold during feeding gave a better block—was their claim. There was no "pressure" used in defendants' machine that we saw. Any further compacting was done by tamping.

And plaintiffs cannot now minimize the importance of these two features because too much importance was placed upon them before the patent office. As stated in Lektophone Corporation v. Rola Co., D.C., 27 F.2d 758, 760, plaintiff "represented, insisted, and demonstrated the necessity, that therein was his discovery and invention, that it was of the essence and essential to success, was what enabled direct regeneration of sounds, must be employed, attains novel results, and was an essential characteristic of his invention."

The Supreme Court has repeatedly held that statements or claims made before the examining board cannot be repudiated later in a patent suit. See Smith v. Magic City Kennel Club, 282 U.S. 784, 51 S.Ct. 291, 75 L.Ed. 707, and Lektophone Corporation v. Rola, supra.

Conclusions of Law

It is the law as we understand it that where a patent limits itself to certain

claims when its other claims have been disallowed because of the prior art, the allowance of the claims as received by the patent does not permit the inventor to enlarge those claims but calls for a narrow construction of the same. Goodrich v. Ford Motor Co., 6 Cir., 97 F.2d 427; Baldwin Rubber Co. v. Paine & Williams Co., 6 Cir., 107 F.2d 350; Smith v. Magic City Kennel Club, supra.

But the main feature of the Gelbman method patent emphasized again and again was not the pressure head being applied while vibration of the mold was going on but that the mold was vibrating while the mix was being poured into it. This is not the method used in the Lith–I Bar machine. It was this argument that permitted the Gelbman method claims to prevail over the prior art as found in Stockwell 384,295, Easterday 1,523,936, Dahl 1,777,660 and Jackson 1,787,449. According to plaintiffs, this vibration of the mold while the mix was being poured gives it a "superior" block. If this is true plaintiffs cannot complain if defendants' machine operates differently and, resultingly gets an allegedly "inferior" block.

We believe that the claims of the Gelbman method patent cannot be held valid unless they are sharply, narrowly and critically limited. 48 C.J., 1929 Ed., Sec. 349, p. 220. This was evidently the intent of the Patent Board of Appeals when it granted the claims. It was, to say the least, the chief reason for the invention as disclosed by the file wrapper. It is not a question of equivalents. Graver Tank Mfg. Co., Inc., v. Linde Air Products Co., 339 U.S. 605, 70 S.Ct. 854, does not apply.

We therefore hold that while the validity of claims 1 and 2 may be supported with reason, the charged infringement thereof by defendants cannot. We take into consideration also that there is some evidence that the machine at Rogers City did use a combination of pressure and tamping while there was vibration after the feed box was removed. But it did not vibrate the mold while it was being filled and furthermore it used a combination of pressure with tamping—not pressure alone —another debatable difference. We find no infringement of the Gelbman method patent by defendants.

## Summary

We deem it necessary to add a general summary of what we have endeavored to cover by this opinion.

The record shows that both the Besser and Lith–I Bar machines use combinations of prior art and prior patents. For example, Besser uses the Scott patent which suspends the mold away from the frame during vibration. His machine also uses the chief feature of the Gelbman apparatus patent—vibration of the mold away from the feed box. Now, since the Scott patent which is "vibration" only did not produce a satisfactory concrete block of itself, particularly a block of the quality and number that Besser wanted, neither did the Scott plus the Gelbman apparatus patent until Besser added the Gelbman method patent, which provided for vibration of the mold during filling and during pressure.

It must also be remembered that the Gelbman apparatus patent did not provide for suspension of the mold by springs; that there was "vibration" before the Gelbman patent; and that pressure and tamping has been long known to the trade— not on the same scale nor as commercially acceptable, but nevertheless these features were not entirely new. However, even after Besser had a machine that could use the Scott and the two Gelbman patents, he found it necessary or advisable to add "agitators" inside the feed box to have his machine work the way he wanted it to. Today the Besser machine as it is constructed is a combination of Besser, Scott, Gelbman and agitators.

On the other hand the Lith–I Bar machine has a semi-suspension of the mold which in our opinion does not infringe the Scott patent either in that suspension or in the subsequent ejection. It does, however, infringe the Gelbman apparatus patent because the Lith-I Bar machine is so constructed that it "wears" its feed box into a separation from the vibrating mold. If, as contended by defendants, seepage

alone will cause the feed box to vibrate while the mold is vibrating why did the Lith–I Bar Company go to the trouble and expense of constructing a machine that quickly works itself into an infringement of another machine? If the Lith–I Bar would make a machine where it clearly keeps the feed box and mold in contact during vibration, it would not infringe but what this court saw requires it to hold that the defendants' machines do infringe Gelbman apparatus claims which claims we hold are valid.

### Other Issues

Practically all of the patents cited by defendants in the prior art were considered in the file wrapper (Shinn was not).

We also find there was no expansion of defendants' business based on plaintiffs' inaction in bringing suit since defendants relied more on advice of counsel that there was no infringement than on plaintiffs' inaction. There is no evidence of unreasonable delay nor is the court impressed with the threats allegedly made by plaintiff, Besser Manufacturing Co., against any of these defendants.

### Conclusions of Law

General conclusions of law as to the efficacy of the file wrapper being prima facie presumption of validity of a patent will be found in United Shirt & Collar Co. v. Beattie, supra, and Modern Products Supply Co. v. Drachenberg, supra.

There is also the fact that the patented features were successfully used in commercial practice. Gates Rubber Co. v. B. F. Goodrich Rubber Co., supra and Railroad Supply Co. v. Hart Steel Co., 7 Cir., 222 F. 261.

A judgment in accordance with this opinion will be presented to the court for its signature.

### On Rehearing

A rehearing was held in the above matter and the court is convinced that it was in error when it held that the Scott mechanism was not patentable on the theory that it was an "aggregation", not a combination.

True, concrete blocks had been made before the Scott machine, and this court in its original opinion above (p. 388 supra), stated that the net result of the Scott patent was—a resiliently mounted mold, the high speed and vibration, plus means of ejection, resulting in nothing more than "a concrete block ready for the market."

However, the Scott patent goes beyond the category of just another block. By it one got a better block, cheaper and at greater speed. While the distinction between aggregation and combination is sometimes but a hair's breadth, nevertheless, upon reconsideration we are now convinced that the Scott patent falls in the latter class.

This does not affect, however, the infringement. We hold there is no infringement nor was there any matter or law presented at the rehearing that motivates us to change any other part of the opinion.