**UNITED STATES v. BESSER MFG. CO. et al.**

**Civ. No. 8144.**

United States District Court
E. D. Michigan, S. D.

Jan. 30, 1951.

John W. Neville, William E. Speer, Detroit, Mich., for plaintiff.

John W. Babcock, Detroit, Mich., Fildew, DeGree & Fleming, Detroit, Mich., Leo Goreff, New York City, Morris Gelbman, Yonkers, N. Y., Carl R. Henry, Alpena, Mich., for defendants.

PICARD, District Judge.

The government brings this action under Section 4 of the Sherman Anti-Trust Act,

Ch. 647, Sec. 4, 26 Stats. 209, 15 U.S.C.A. § 4, charging that defendants conspired to, and did, create a monopoly in the manufacture of concrete block making machines in violation of Sections 1 and 2 of the Act, 15 U.S.C.A. §§ 1, 2. Defendants are Besser Manufacturing Company and Stearns Manufacturing Company, Inc., producers of concrete block making machines, Jesse H. Besser, who owns 99 per cent of the Besser Manufacturing Company (his wife 1 per cent) and Louis Gelbman and Hamlin F. Andrus, who owns important patent rights used in the machines produced.

It is first necessary, therefore, to determine whether the facts prove that a monopoly has been created.

Besser Manufacturing Company (hereinafter called "Besser") is not only a pioneer but today admittedly holds a dominant position in manufacturing concrete block making machines. The company was founded by the father of Jesse H. Besser at Alpena, Michigan in 1897 as a stave and shingle mill and in 1904 expanded into the concrete block making machine business. At that time each step in the making of concrete blocks was entirely by hand beginning with the proper mix being shoveled into forms, tamped and then taken out. One machine could produce 150 blocks per day. Since then the industry has gone through various stages from "hand" to the "power tamper" (developed by Besser in 1909—capacity 450 blocks per day).; the automatic feeder in 1914 (capacity 1,800 blocks per day) until 1924 when the Besser plain pallet stripper tamper was invented and one machine was capable of producing 3600 blocks one at-a-time in an 8 hour day. This patent, issued in 1929—and this fact becomes important—expired in 1946. Besser also later purchased the Scott patent rights applied for in 1927 and granted in 1938. Scott as decided by this court, Andrus v. Whitman, D.C., 93 F.Supp. 383, was a patent covering vibration of the mix in the form.

In 1939 came the Gelbman-Andrus patents with their coordinated vibration and tamping machines that received the mix into the vibrating form followed by automatic pressure. With the present Besser Super Vibrapac it is possible for one machine to make over 6,000 standard size 8″ x 8″ x 16″ blocks in one 8 hour day. But there are still concrete block making machines of the hand tamping type being manufactured, utilized and a few sold. Still others are semi-automatic.

So if we are to consider the production possibilities of all concrete block making machines that were being manufactured by the 50 odd concerns for the years 1946–7–8 the figures are as follows: **

| All Other Manufacturers | | Besser and Stearns | |
|---|---|---|---|
| 1946 Tampers-Vibrators | | Tampers-Vibrators | |
| 334 | 1048 | 140 | 356 |
| Total | 1382 | Total | 496 |
| 1947 266 | 351 | 79 | 407 |
| Total | 617 | Total | 486 |
| 1948 101 | 331 | 18 | 195 |
| Total | 432 | Total | 213 |

** in million blocks per year.

Defendants insist that this "production capacity" should be the yardstick to determine whether the Besser-Stearns combined companies have a monopoly and not the "dollar value" of those machines as contended by the government.

On the other hand, the government insists that the use of dollar value is the normal, reasonable and correct method of measuring industry position particularly where the high production automatic machines of the vibrator type assume such a controlling position in that industry.

It points to sales figures demonstrating the importance of the vibrator type machine, which show that in 1946 vibrator machines sales represented 79.6% of total dollar industry sales; in 1947, 83.6%; and in 1948, 91.8%. Of this latter total, Besser and Stearns controlled 69%. To the government these figures become even more revealing when it is considered that a substantial part of the industry to which defendants refer, is not in competition with companies manufacturing the high production machines, for it claims that these low production machines afford no more competition than do hand shovels to large powerful excavating equipment. It reasons that "dollar value" of the machines manufactured should be the yardstick and if we consider this formula as a basis to

determine whether the Stearns-Besser combination has a monopoly in the concrete block making machine industry we learn the following:

In Dollar Sales of Entire Industry

| | Besser and Stearns | The 53 Other Manufacturers |
|---|---|---|
| 1946 | 49.7% | 50.3% |
| 1947 | 67.2% | 32.8% |
| 1948 | 65% | 35% |

Note: In 1946 Besser secretly purchased 13,000 shares of Stearns stock, its chief competitor, and in 1948 succeeded in buying 74,000 shares more. Besser then held 87,000 of the 198,833.5 shares of Stearns stock outstanding and forthwith elected three out of the five men on the Stearns board.

The evidence further shows that among the 50 odd companies which divided the 35 per cent of dollar sales in 1948—

Lith-I Bar had.............7.8% of whole
J. W. Appley..............5.9% " "

leaving the other 50 odd companies to divide the remaining 21.3 per cent.

The question is whether the court should consider "dollar value" or "production capacity" and here defendants insist that the bill of complaint eliminates any possibility of dollar value because it uses the word "production" which defendants interpret as meaning the "number" of blocks that can be made by those machines.

The court does not decide whether defendants' control of 33 per cent of the output possibilities from all machines produced constitutes a monopoly but incidentally it was held in United States v. Reading Co., 253 U.S. 26, 40 S.Ct. 425, 64 L.Ed. 760 that 33⅓ per cent of the total output of anthracite coal carried by defendant was sufficient to be a monopoly and in United States v. Lehigh Valley R. R. Co., 254 U.S. 255, 41 S.Ct. 104, 65 L.Ed. 253 the figure of 18.84 per cent. In any event we hold to no such narrow interpretation of the word "production." Nor has the plaintiff so limited itself, for in paragraph 14

of the complaint it charges defendants with restraints and monopoly in interstate commerce of concrete block machinery. "Commerce" is the business of buying and selling of commodities for money, Montague & Co. v. Lowry, 9 Cir., 115 F. 27, 63 L.R.A. 58, affirmed 193 U.S. 38, 24 S.Ct. 307, 48 L.Ed. 608; U. S. v. Swift & Co., C.C., 122 F. 529; and here the commodity to which the government has reference is the concrete block machine, not its end product. But to this court "production" may mean either "production capacity" or "dollar value" dependent upon the commodity and here we determine that dollar value may be the measuring gauge. In this deduction we are fortified by decisions of our courts where dollar value has frequently been used, U. S. v. U. S. Gypsum Co., 333 U.S. 364, 68 S.Ct. 525, 92 L.Ed. 746, but more particularly in U. S. v. American Can Company, D.C., 87 F.Supp. 18, where the court considered that defendant had a monopoly on tin plate because it manufactured more than 200 million dollars worth of cans out of a total tin plate worth upwards of 500 million dollars. In fact "dollar value" is used throughout that opinion.

We also note with interest page 115, monograph No. 21, "Investigation of Concentration of Economic Power," Temporary National Economic Committee (76th Congress, 3rd Session); and Department of Commerce Report (Census of Manufacturers) to House of Representatives Subcommittee on Study of Monopoly Power (Celler committee) dated December 1, 1949, where "dollar value" was used in inquiring into the existence of monopoly power and control.

When two closely related corporations have 65 per cent of the dollar value of any industry and the balance is divided between over 50 other manufacturers with the nearest competitor having less than 8 per cent of the whole, we believe that such a combination has to all intents and purposes a monopoly within the meaning of the law. Add to this the fact that it's the big automatics that are important, not the hand tampers or the semi-automatics, and we find the position of Besser-Stearns in the industry is overwhelming.

It has the power in its field to control the prices—meeting the test of the rule laid down in American Tobacco Co. v. U. S., 328 U.S. 781, 66 S.Ct. 1125, 90 L.Ed. 1575 as well as that found in U. S. v. American Naval Stores Co., C.C., 172 F. 455, 458— "The popular meaning of 'monopoly' at the present day seems to be the sole power (*or a power largely in excess of that possessed by others*) of dealing in some particular commodity or at some particular market or place, or of carrying on some particular business." (Emphasis ours.)

We do not conceive that the Sherman Anti-Trust Act, 15 U.S.C.A. §§ 1–7, 15 note, anticipates that no deterring steps can be taken until a 100 per cent monopoly has become a "fait accompli." "It is not essential that its result should be a complete monopoly; it is sufficient if it really tends to that end, and to deprive the public of the advantages which flow from free competition." U. S. v. E. C. Knight Co., 156 U.S. 1, 16, 15 S.Ct. 249, 255, 39 L.Ed. 325.

The Clayton Act, Section 7, 15 U. S.C.A. § 18 aims to strike down a monopoly at its inception, when the first step is taken—Arrow-Hart & Hegeman Electric Co. v. Federal Trade Commission, 2 Cir., 65 F.2d 336, 340; the Sherman Act after it has become more virile.

A committee of the Judiciary of the Senate in its report accompanying the Clayton Act, dated July 22, 1914, said: "Broadly stated, the bill, in its treatment of unlawful restraints and monopolies, seeks to prohibit and make unlawful certain trade practices which, as a rule, singly and in themselves, are not covered by the act of July 2, 1890 (the Sherman Act) or other existing antitrust acts and thus, by making these practices illegal, to arrest the creation of trusts, conspiracies, and monopolies in their incipiency and before consummation." (1949 Cong.Rec. 11730).

We hold that Besser controls Stearns and that the Besser-Stearns alignment created a monopoly.

### Legality.

We come then to the issue of whether this particular monopoly is illegal and we start with the oft repeated holding that the Sherman Act must be given a reasonable construction to accomplish its purpose. U. S. v. Union Pacific R. R. Co., 226 U.S. 61, 33 S.Ct. 53, 57 L.Ed. 124. "Bigness" as such, is not prohibited, U. S. v. U. S. Steel Corporation, 251 U.S. 417, 40 S.Ct. 293, 64 L.Ed. 343; U. S. v. Paramount Pictures, 334 U.S. 131, 68 S.Ct. 915, 92 L.Ed. 1260, although the courts have said that monopolistic power of itself constitutes an evil and is to be condemned whether the acts creating it have been lawful or unlawful. U. S. v. Griffith, 334 U.S. 100, 68 S.Ct. 941, 92 L.Ed. 1236; Schine Chain Theatres v. United States, 334 U.S. 110, 68 S.Ct. 947, 92 L.Ed. 1245; U. S. v. Paramount Pictures, supra.

The rule, however, is that there must be the existence of power "to exclude competition when it is desired to do so" if "coupled with the purpose or intent to exercise that power. [334 U.S. 100, 68 S. Ct. 945.]" American Tobacco Co. v. U. S., supra; U. S. v. Griffith, supra, 334 U.S. 107, 68 S.Ct. 941; U. S. v. Patten, 226 U.S. 525–543, 33 S.Ct. 141, 57 L.Ed. 333; and U. S. v. Aluminum Company of America, 2 Cir., 148 F.2d 416 at page 432 or the intent to bring about the forbidden act, to wit, the monopoly. U. S. v. Aluminum Company of America, supra.

### Power and intent.

As for intent—since this is only a state of mind rarely expressed or written down for the scrutiny of others—the courts generally say that all persons "must be held to have intended the necessary and direct consequences of their acts, and cannot be heard to say the contrary." U. S. v. Masonite Corp., 316 U.S. 275, 62 S.Ct. 1070, 1076, 86 L.Ed. 1461; and cases cited. U. S. v. Patten, supra, 226 U.S. 543, 33 S.Ct. 141; U. S. v. Griffith, supra.

### History of Besser.

Let us then follow development of Besser up to the time this suit was started. We mention this because defendants at one point in their briefs argue strenuously that what has happened since that day cannot be taken into consideration by this court,

while later therein they cite their own acts, after suit filed, aimed at purging themselves of any possible taint of monopoly. But at this point this court is interested only in the status of the alleged Besser combination as of the day of suit.

### Consolidated Concrete Machinery Corporation.

In 1929 the chief competitor of Besser was Consolidated Concrete Machinery Corporation world's largest producer of concrete block machinery units and running Besser a hard race for number one position in dollar sales. One E. F. Olsen was its president and the evidence is conclusive that Consolidated Concrete Machinery Corporation was in distress having taken many steps to preserve its life by manufacturing other products.

It lost $33,040.50 for year ending May 31, 1928,
" " 37,000.00 " " " May 31, 1929,
" " 180,000.00 " " " May 31, 1930,

and in 1931 Besser bought a controlling interest in Consolidated "at the request (Besser's testimony) of one of Consolidated's stockholders who had loaned it some money."

Besser then revamped Consolidated's board of directors by naming four of its seven members and in 1932 the company was dissolved; what was left of the plant moved to Alpena and its real estate sold.

The government contends that here was the first step in the design of Besser to accomplish its monopoly.

We cannot agree with this conclusion.

Our memory reverts to the years 1929, 1930 and 1931 and Consolidated only went the way of many other companies that might have survived if there had been no depression. If Besser, closely held, efficiently managed, and with its payroll limited in the high brackets, was able to continue business and buy out a competitor at that time we can see no objection.

### Brownhoist.

The court takes the same position regarding purchase by Besser of the Brownhoist block making equipment, inventory and other assets in 1935. Only an infinitesimal part of the Brownhoist business was devoted to concrete block machine manufacture and Brownhoist was moving back to Bay City from Cleveland where the operation of such a business could be a thorn in Besser's side right in its own backyard. Bay City is the first large city in the vicinity of Alpena. Of course we do not contend that one may, with impunity, remove all such thorns but there can easily develop unfair competition by a company operating a "sideline" that cripples a legitimate business wherein the "sideline" is the main object of its existence. To hold its elimination of such possible menace by purchase, rather than pushing the infringement suit it had threatened, was wrong, might encourage a philosophy that could destroy rather than help free enterprise and the ultimate development of our economic life. In our opinion it cannot be successfully reasoned that these two acquisitions—Consolidated and Brownhoist—were attempts by Besser to promote its position to a monopoly of this industry.

We therefore see nothing illegal about the Brownhoist transaction.

But must the charges fall completely because plaintiff's allegation of 1931 as the beginning date of the conspiracy or monopoly, has been refuted?

We know of no rule that limits the government to proof of the exact date the attempt or realization of the monopoly began. The government must, of course, be held within the ambit of its charge and we believe that 1942 specifically included in the bill of complaint, was within that ambit. Here we find what this court believes to be the most important development of the Besser empire for in 1942 was when Besser and Stearns agreed to control the Gelbman-Andrus patents which contract we will discuss later.

But continuing we learn that by 1946 there was a building boom in the United States which is still unsatisfied. Shortage

of steel and other construction materials made concrete blocks more desirable and hence more salable. In addition they had been improved in style, attractiveness, efficiency and stability. The hand of fate and the business acumen of Besser had disposed of its chief competitor, Consolidated, back in 1931, but as there is always at least one automobile on the road ahead, no matter how many you overtake, there is likewise always a chief competitor to give you concern. In the instant case there were two main road blocks against Besser realizing its exclusive place in the sun—Stephen Flam, Inc. of California and Stearns Manufacturing Company of Adrian, Michigan.

### The Flam Sale.

Back in 1938, Besser had made a contract with Stephen Flam, Inc. of California, whereby Besser was given exclusive rights not only under Flam's existing patents but also under "any apparatus, machinery and devices which may be equipped with any type of vibrating or jolting devices other than as disclosed and claimed in said patents" such rights to be exercised throughout the United States except that Flam retained the right to manufacture in nine western states.

Then in 1946 Besser bought out Flam completely, for $385,000 and in that year the conspiracy and monopoly undeniably began to show substance. The reasonable deduction is that Flam was giving Besser too much competition in nine states reserved to it. Flam was then fourth in dollar sales in the United States so Besser decided to remove this fly in the ointment. It purchased Flam's exclusive licenses, had Flam agree to stay out of the concrete block machine making business for 8 years and to make sure that it did, it gave Flam a job for 5 years. Then it went further— it got exclusive rights to any future patents Flam might get during the 5 years he was working for Besser.

### The Besser-Stearns-Andrus-Gelbman Contract.

This deal was the climax.

Besser's customer, Bell, had been sued in 1941 by co-defendants Gelbman and Andrus for alleged infringement of the Gelbman-Andrus patents then licensed only to Stearns. As a result of the Bell suit an agreement was entered into December 7, 1942, between the inventors and the two separate concerns, Besser and Stearns, whereby Besser, Stearns and the inventors were to live in peace and harmony. Stearns and Besser were each given the right to use the Gelbman and Andrus patents—but exclusively to them—and it was agreed that they were to have the benefit of, and right to use, any and all future improvements and patents covering concrete block making machines that might come from the fertile minds of either Andrus or Gelbman or both.

But this contract also contained a provision that not only prohibited the patentees giving any one else a license, it also prevented either Besser or Stearns from joining Gelbman and Andrus in giving other prospective licensees the right to use any of the patents covered without the others' consent.

The above and Flam agreements are bitterly attacked by the government as illegal and the main overt acts in the monopolistic achievement.

Let us concentrate on the above Besser-Stearns-Gelbman-Andrus 1942 contract.

Unquestionably its purpose was to make certain that these two giants of the industry didn't battle each other over patents any more. But is there anything in the agreement itself frowned upon in the light of recent decisions of our Supreme Court? Does control of a patent give the patentee or licensee the rights contended for by defendants either solely or together?

Granting that an exclusive license may be valid, Crown Die & Tool Co. v. Nye Tool & Machine Works, 261 U.S. 24–37, 43 S.Ct. 254, 67 L.Ed. 516; U. S. v. General Electric Co., 272 U.S. 476–489, 47 S.Ct. 192, 71 L.Ed. 362, the Supreme Court has recognized certain limitations, and where such a license has for its purpose the suppressing of competition, it has been held invalid. "The Sherman law is a limitation of rights,—rights which may be pushed to evil consequences, and therefore restrain--

ed." Standard Sanitary Mfg. Co. v. U. S., 226 U.S. 20–49, 33 S.Ct. 9, 15, 57 L.Ed. 107.

We believe that the contract under question goes further than is necessary to protect the patent monopoly of Gelbman and Andrus. It may well be that an exclusive license to one party would be valid, but here the patentees have joined hands with the two largest competitors in the industry and by terms of their agreement have virtually made it impossible for others to obtain rights under those patents. The contract even gives Stearns and Besser the power to restrict competition—present and future—by requiring their joint consent before licensing others. It is this combination requiring collective action that primarily invalidates the agreement. We believe it clear that the parties intended this contract to be a means whereby control of the industry could be acquired and competition eliminated. For what other reason would Besser or Stearns want the consent of the other before approving a licensee suggested by the patentees? And where it is apparent, as it is here, that the contract is to eliminate competition, it must be held illegal. As the court stated in U. S. v. Parker-Rust-Proof Co., D.C., 61 F.Supp. 805, 813; "The primary purpose for entering into this contract was to eliminate present competition and prevent future competition. The Anti-Trust Acts condemn a contract entered into for the purpose of eliminating competition that exists as well as a contract preventing the development of future competition."

Still these contracts go further. The intent to restrain trade and the illegality is further augmented and evidenced by the provision in both the four-way agreement of 1942 and the Flam purchase contract granting exclusive rights to Besser and Stearns of all improvements to the existing patents and to inventions still unborn. Such conditions while not illegal, per se, cannot be justified as necessary to the enjoyment of or ancillary to the patent rights conveyed, U. S. v. National Lead Co., D.C., 63 F.Supp. 513, 524; U. S. v. General Electric Co., D.C., 80 F.Supp. 989, 1005; Transparent Wrap Machine Corp. v. Stokes & Smith Co., 329 U.S. 637, 67 S.Ct.

610, 91 L.Ed. 563, and read in conjunction with the rest of the contract provisions and other acts herein enumerated, makes the conclusion inescapable that the Besser-Stearns group had and achieved an obvious objective that cannot be reconciled with the restrictions of the Sherman Anti-Trust Act.

These agreements are in our opinion fatal to defendants and as of the day of the trial were the wrongful acts of not only Besser in the Flam contract but in the December 1942 agreement of all other defendants including Gelbman and Andrus. The latter took advantage of that contract and were active participants in threatening with suits those who supposedly violated their patents by infringement. Gelbman and Andrus were anxious not to protect their patent rights but to protect their contract with Besser and Stearns. And it all stems back to 1942 when Gelbman and Andrus entered into this agreement with Besser and Stearns. Then was the real beginning of the fruition of the monopoly, resulting from a conspiracy of the parties to that agreement to accomplish an illegal objective.

We pass now to 1946. Up to this point Besser apparently hadn't done anything about the Stearns Manufacturing Company, probably because Besser owned the plain pallet patents expiring that very year, and partly because Stearns was devoting itself to the Jolt-Crete type of machines. But when it was learned that the Stearns Company was planning on manufacturing a plain pallet concrete block making machine that's when Besser became interested. That's when Besser through its agent secretly purchased a good share of the Stearns stock and finally in 1948 secured sufficient of that stock so that out of 198,833.5 shares Besser owned 87,000. Besser then put its own men on the board and we find it hard to believe that Besser didn't use any influence on its three directors. Perhaps it wasn't necessary. Perhaps satisfactory results were being obtained without pressure and if the figment of separate entities could be maintained so much the better. In any event, in 1948 Besser's hold on its second chief competitor be-

came, to all intents and purposes, complete.

Then followed real activity by Besser and members of its organization, some of it before Besser had gobbled up Stearns. The little fellows were in the way and what appears to have been a deliberate campaign to wipe out all remaining competition started.

Besser tried to buy out Go-Corp founded by Olsen after he left Stearns, and continued this activity right up to the time of the hearings in this case.

There was testimony undenied, that Park, Vice-President of Besser, tried to buy Lith-I Bar and that Besser "considered it imperative that the Lith-I Bar Company be out of business."

Besser offered jobs to Milewski of Lith-I Bar, to Olsen and his son, as it had done previously to Stephen Flam.

Then one Millard Warren (1947) built two or three block machines that Besser claimed infringed on its patents. Warren yielded to pressure, threats, and being offered "pay" without leaving his own business.

Others, Darden, Ralph Samuelson, Hanneman, John B. Lagarde, Bernard Flam, son of Stephen, all felt the persuasion of the Besser arguments. Besser brought influence on a material supply source of Darden that curtailed the Warren output since Darden was building the Warren machine. Practically all these men got out of their own business, generally impelled by threats of law suits, being given a job, pressure on customers, or all three, and usually Besser picked up their then patents with a mortgage on the fruits of their genius for years to come.

It attempted to limit Appley to "cored pallet" machines that can make 2 blocks at a time and Appley signed the contract prepared by Besser. A cored pallet (2 at a time) machine incidentally has a maximum output of 4,800 blocks per day but costs the producer about 5 times as much to operate as the plain pallet machine.

The proof further showed that Besser personally indicated his attitude towards competitors by his letter to Gelbman, December 21, 1946, saying: "About the worst thing that could happen to this industry would be to have it wide open so that anybody and everybody could make machines and thus have no control on quality and no opportunity for anyone to do anything very important."

There were other letters that denote Besser's objective to accomplish the elimination of almost every competitor through (1) recklessly made threats of suit, illegal under Maytag Co. v. Meadows Mfg. Co., 7 Cir., 35 F.2d 403; Dittgen v. Racine Paper Goods Co., C.C., 164 F. 85, 89; U. S. v. Patterson, D.C., 205 F. 292; (2) purchase of assets, illegal under U. S. v. Union Pacific R. R. Co., supra; U. S. v. Reading Co., 253 U.S. 26, 40 S.Ct. 425, 64 L.Ed. 760; U. S. v. Lehigh Valley R. Co., 254 U.S. 255, 41 S.Ct. 104, 65 L.Ed. 253, and (3) covenants not to compete, illegal under Schine Chain Theatres v. U. S., supra; Shawnee Compress Co. v. Anderson, 209 U. S. 423, 434, 28 S.Ct. 572, 52 L.Ed. 865; U. S. v. American Tobacco Co., 221, U.S. 106, 31 S.Ct. 632, 55 L.Ed. 663.

It further appears that there were two or three instances where suit was threatened involving machines that agents of defendants had never even seen. The threat of a law suit for infringement should be bona fide and one asserting the exclusive right granted by the United States should not indiscriminately abuse that right. At least an examination should be made of the charged machine and then a law suit if necessary or at least negotiations started. Emack v. Kane, C.C., 34 F. 46; Adriance, Platt & Co. v. National Harrow Co., 2 Cir., 121 F. 827; U. S. v. Patterson, supra; Dittgen v. Racine Paper Goods Co., supra.

Such a statement as made by Olsen, then president of Stearns, to Darden in the presence of Gelbman and Besser that "there is only about $700,000.00 gross business normally in this business; we are able to take care of that, the Besser Manufacturing Company and the Stearns Manufacturing Company; there isn't any room for your company" or

The Stearns letter to Gelbman (copy to Mr. Besser) referring to Darden's audacity in daring to compete in the concrete block

machine industry—"Stories are persistent to the effect that Darden is doing quite a lot of business and is rather rapidly expanding his organization. It might be easier to knock his ears down now than later," have no place in the economic struggle of business, large or small, in this country nor have many of the other acts testified to against defendant Besser.

Then one further fact. Defendant Besser had during the years in question developed a leasing system, which of itself is not to be condemned, but which nevertheless adds to the realization of a complete monopoly. As improvements have been made in these units they have become larger, heavier and more expensive. They run as high as $50,-000 each and of course there will be no stampede to buy machines at this price. It is far beyond the reach of the small manufacturer. So Besser began the leasing system paid for at the capacity of the machine at 1 cent a block. This is possibly as economical as these blocks can be made by hand or by other automatics and the ultimate effect on the existence of small companies can easily be visualized. A great deal of this springs from the grip that the Besser-Stearns combination got on the industry during the crucial period—1946–1948 —when Besser started getting its control over Stearns, just when the plain pallet patent of Besser was about to expire and Stearns had indicated that it was going to make plain pallet machines. Stearns, standing alone, could have then become even a greater competitor of Besser because it still had the right to use the Gelbman and Andrus patents; but Stearns—controlled—presented opportunities that Besser could not resist.

So all this was stopped by Besser. Regardless of whether it actually exercised control over Stearns, it was in a position to do so and could have been interested in Stearns for no other reason.

While it must be admitted that not all of these acts are prohibited, nevertheless, we must view them in the broad panorama of other acts and their association with each other to note, not only the effect—but to pierce the veil for evidence of intent. U. S. v. Patten, supra; Swift & Company v. U. S., 196 U.S. 375, 396, 25 S.Ct. 276, 49 L.Ed. 518; U. S. v. Paramount Pictures, supra; American Tobacco Co. v. U. S., supra, 328 U.S. 809, 66 S.Ct. 1125; Montague & Co. v. Lowry, 193 U.S. 38, 24 S.Ct. 307, 48 L.Ed. 608; Fashion Originators Guild v. Trade Commission, 312 U.S. 457, 61 S.Ct. 703, 85 L.Ed. 949; and Associated Press v. U. S., 326 U.S. 1, 65 S.Ct. 1416, 89 L.Ed. 2013.

It is clear then that the intent of Besser—with its Stearns control—to dominate this industry by monopoly is obvious and that the result of the Gelbman-Andrus-Besser-Stearns conspiracy was to restrict competitors which latter is illegal under the Sherman Act. (above citations)

And here is another instance that we believe speaks volumes.

*The Stone Contract.*

When the hearings started in this case this court was surprised to find that there had been a falling out between certain stockholders of the Stearns Company and Besser. We soon learned, however, that just a month or so previous Besser had made a contract by which one, Stone, was to purchase part and eventually all Besser shares in the Stearns Company thus purging Besser of all taint of the monopoly that it claimed did not exist. But the contract provides so many possibilities of this interest reverting back to Besser that we have some hesitancy in accepting at face value Besser's protestations, that Stone came into the picture just because he, Stone, "likes to turn an honest dollar" and had suddenly become enamored by the concrete block making machine and Aglite businesses.

Nor are we overly impressed with the sudden conversion of certain stockholders of Stearns who now favor the government's action. It is apparent that they are not interested in adopting the government's viewpoint from any altruism, but, having failed to purchase the Stearns' stock from Besser, are now determined that Stone won't become dominant in their company. They are aware also that if Stone's agreement with Besser prevails, Stearns will lose some of its patent rights; it will be obliged to recognize the validity of other

Besser patents; it will also admit that it had no right to use certain patents Stearns has been using for years; it will be limited to the manufacture of two at-a-time pallet machines; it may have troubles on its own patents with Besser and, finally, Stearns will be saddled with the Aglite business that is promoted by Besser to increase the sources where concrete block men may get their material, now limited.

Which impels us to inquire "Why, if defendant Besser considers itself free from violation of either the Clayton or Sherman Anti-Trust laws—is it so anxious at this time to apparently divest itself of its Stearns connection?"

To this court it is a practical admission that Besser not only has a monopoly, but knows that it has one and is seeking to superficially cleanse itself of all taint of monopoly while retaining all its benefits.

### A Good Monopoly.

May we not further examine what effect Besser's combination has had on the price of blocks—not on block making machines—but on the blocks themselves? Here the court was again surprised to learn that blocks cost practically the same now as they did 15 years ago—about 16 or 17 cents each. At first blush therefore it appears that this is a "good monopoly."

Admittedly Besser personally has profited and Besser personally has done much for this industry, but the price of blocks today compared to 15 years ago is due—for one reason—to the tough fiber of the competition, although limited, that refused to give up and second because the present Besser machines can make over 6,000 blocks per day as against 3,600, 15 years ago. But then there is no assurance that this will continue to be a so-called good monopoly. Besser management may possibly change. Even under Besser the pressure on competitors has risen considerably in the last three years. If this continues for the next three years in the same ratio it can hardly be expected to be hailed as a good monopoly under any reasoning. Furthermore, it might lower its lease agreement terms tomorrow and those who use Besser machines can sell blocks at less.

Then what happens to the little competitors is what happens in every price war—they finally "fold their tents" like the Arabs.

But it is now generally recognized that no trust or monopoly obtained by illegal means should be permitted to exist whether it is good or bad. See U. S. v. Crescent Amusement Co., 323 U.S. 173, 187, 188, 65 S.Ct. 254, 89 L.Ed. 160; U. S. v. Griffith, supra, 334 U.S. 107, 68 S.Ct. 941; American Tobacco Co. v. U. S., supra, 328 U.S. 811, 66 S.Ct. 1125.

The statute does not differentiate. As stated in U. S. v. Aluminum Co. of America, supra, 148 F.2d 427; "Be that as it may, that was not the way that Congress chose; it did not condone 'good trusts' and condemn 'bad' ones; it forbad all."

### Conclusion.

We conclude that the defendants, Besser, Stearns, Andrus and Gelbman have combined and conspired to restrain and to monopolize interstate trade and commerce in concrete block machines in violation of Sections 1 and 2 of the Sherman Act, and that Besser Manufacturing Co. and Jesse H. Besser have attempted to monopolize and have monopolized said trade and commerce in violation of Section 2 of the Act.

We hold, therefore, that this court must bring Besser's activities within the restrictions of the Sherman Act by the following steps:

First, that the Besser interest must dispose of its holdings in the Stearns Manufacturing Company, Inc.;

Second, that the Gelbman-Andrus patents listed in the December 7, 1942 agreement, plus all improvements and inventions made subsequently and which come within the terms of said agreement, be made available to everyone in the industry on the same terms;

Third, that all lessees of Besser machines may at their option withdraw as a party to such leases providing said option is exercised by July 1, 1951, Besser to notify each lessee of his right of withdrawal; and

Fourth, that each of the parties to that December 7, 1942 contract be and is hereby enjoined from entering into a like agree-

ment with each other or any other person, corporation or combination.

Since defendants now claim that they want to dispose of their Stearns interest and since Besser, according to defendants' brief page 28, is willing to remove all restrictions on use of the Gelbman-Andrus patents, the order of this court should not impose any great hardship except that there must be no conditions attached to disposal of the Stearns stock. When this is done, sanctioned by the approval of this court, the purposes of this action will have been accomplished.