Roy W. DARDEN, and Roy Darden Industries, Inc., Plaintiffs,

v.

Jesse H. BESSER, Besser Manufacturing Company, and Stearns Manufacturing Company, Inc., Defendants.

No. 11765.

United States District Court
E. D. Michigan, S. D.
Dec. 27, 1956.

Justin L. Giltner, Detroit, Mich., Burns, Doane & Benedict, Washington, D. C., for plaintiffs.

Fildew, DeGree, Fleming & Gilbride, Detroit, Mich., Carl R. Henry, Alpena, Mich., Rockwell T. Gust, Sr., Detroit, Mich., for defendants.

LEDERLE, Chief Judge.

## Findings of Fact

1. Plaintiffs in this action are seeking to recover damages under Sections 4 and 5 of the Clayton Act, 15 U.S.C.A. §§ 15 and 16, on the ground that they have been injured in their business and properties by reason of violations by defendants of Sections 1 and 2 of the Sherman Act, 15 U.S.C.A. §§ 1 and 2. Plaintiffs rely, in part, on a judgment rendered in this Court on behalf of the United States holding that these defendants and others had monopolized the business of manufacturing and selling concrete block machinery. United States v. Besser Mfg. Co., D.C., 96 F.Supp. 304, affirmed 343 U.S. 444, 72 S.Ct. 838, 96 L.Ed. 1063.

2. The plaintiff, Roy W. Darden, hereinafter referred to as "Darden," is a citizen of the United States and a resident of Atlanta, Georgia.

The plaintiff, Roy Darden Industries, Inc., hereinafter referred to as "Darden Industries," is a corporation organized and existing under the laws of the State of Georgia, with offices and principal place of business at Atlanta, Georgia.

The defendant, Jesse H. Besser, hereinafter referred to as "Besser," is a citizen of the United States and a resident of Alpena, Michigan, and is president and was, on the date his answer was filed, principal stockholder of defendant, Besser Manufacturing Company.

Defendant, Besser Manufacturing Company, hereinafter referred to as "Besser Company," is a corporation organized and existing under the laws of the State of Michigan, with offices and principal place of business at Alpena, Michigan.

Defendant, Stearns Manufacturing Company, Inc., hereinafter referred to as "Stearns," is a corporation organized and existing under the laws of the State of Michigan, with offices and principal place of business at Adrian, Michigan.

All of the defendants are inhabitants or residents of, transact business in, and are found within the Eastern District of Michigan.

3. The parties hereto are and have been at all times relevant hereto, engaged in the business of manufacturing and selling concrete block machinery. These machines are manufactured for and sold extensively in interstate commerce.

4. Concrete building blocks and other concrete masonry units are utilized extensively in the construction of residential, farm and commercial structures. The commercial production of such blocks and units is almost entirely accomplished by machines, herein referred to as "concrete block machines," which form and compress a concrete mixture into molded units of a size and shape suitable for building purposes.

5. Some block machines utilize a hand or power tamp for settling and packing the concrete mixture into the mold and other machines use vibration or a combination of vibration and pressure for this purpose. Block machines also range in size and complexity from hand operated units to completely automatic units capable of turning out three blocks at a time. The highest production and greatest efficiency and economy are obtained by these automatic machines of the vibration type, some of which by 1947 were capable of producing over 800 standard sized concrete blocks per hour. The market for such machines is necessarily limited by its own high production and the very substantial investment required for their purchase.

6. Sales of concrete block machines are normally accompanied by sales of auxiliary equipment, such as concrete mixers and attachments. In 1946, both Besser Company and Stearns had been in business for many years and had thousands of machines in the field. They had extensive service facilities and large

sales organizations and did a large volume of business in maintenance parts. Both did national advertising and had a variety of machines on the market.

7. At the end of World War II, the demand for block machines became too great for the established companies to meet. Besser Company and Stearns were a year to eighteen (18) months behind in deliveries. By the end of 1946 or early 1947, this abnormal demand was largely filled and the established companies experienced a sharp and steady decline in sales. It became necessary for block machine makers to finance sales of their machines and to take in old machines in trade.

8. On April 28, 1949, the United States filed a civil suit in the United States District Court for the Eastern District of Michigan, charging all of the present defendants and Louis Gelbman and Hamlin F. Andrus with violations of Sections 1 and 2 of the Sherman Act. After a lengthy trial, the Court rendered its opinion on January 30, 1951, 96 F.Supp. 304, that all defendants had combined and conspired to restrain and monopolize trade and commerce in concrete block machines in violation of Sections 1 and 2 of the Sherman Act and that Besser and Besser Company had attempted to monopolize and had monopolized said trade and commerce in violation of Section 2 of the Sherman Act. Judgment was entered on April 12, 1951. Thereafter, Besser and Besser Company appealed to the United States Supreme Court which, on May 26, 1952, affirmed the judgment of the District Court, 343 U.S. 444, 72 S.Ct. 838, 96 L.Ed. 1063. A new final judgment was entered by the District Court on July 20, 1952. This judgment is relied on here by plaintiffs as prima facie evidence under 15 U.S.C.A. § 16.

9. In the foregoing action, the District Court found the following facts relevant to the present suit:

a. That on December 7, 1942, Besser Company and Stearns became licensees under a patent license agreement with Gelbman and Andrus which provided that no further licenses would be given without the consent of both Besser Company and Stearns.

b. That the patents forming the basis of the aforesaid license agreement were used by Besser Company and Stearns in a campaign to threaten competition with suits for alleged patent infringement.

c. That Besser brought influence on a material supply source of Darden Industries that curtailed the output of concrete block machines by Darden Industries.

d. That Besser controlled Stearns, such control having to all intents and purposes become complete in 1948.

The Court concluded that:

a. The aforesaid license agreement of December 7, 1942 was illegal.

b. That all defendants in the Government action had combined and conspired to unreasonably restrain and monopolize trade and commerce in concrete block-making machines in violation of Sections 1 and 2 of the Sherman Act.

c. That Besser and Besser Company had attempted to monopolize and had monopolized trade and commerce in concrete block-making machines in violation of Section 2 of the Sherman Act.

10. In 1938, Roy W. Darden entered the employ of an Atlanta, Georgia, concrete block manufacturing plant known as the Concrete Manufacturing Company. He subsequently became General Superintendent of that plant. In 1941, Darden designed, built, and successfully tested a semi-automatic block-making machine which was subsequently introduced to the trade as the "Rockercrete Machine." Darden left the employ of the Concrete Manufacturing Company in early 1945 and engaged in manufacturing and selling the Rockercrete Machine.

11. In October, 1945, a partnership known as "Roy Darden Equipment Com-

pany" was formed in which Darden had a 75 per cent interest and one Milton E. Posey a 25 per cent interest. During the year 1945, Darden and subsequently the partnership sold a total of 12 to 15 Rockercrete Machines.

12. On or about February 5, 1946, Darden Industries was incorporated with a capitalization of twenty thousand dollars ($20,000) of which approximately three thousand dollars ($3,000) was goodwill. Darden became president of the corporation, and has held that position up to the present time. The Company maintained a small one-room office in Atlanta and employed a maximum of four people. It had no manufacturing or assembly facilities of its own, its machinery being fabricated initially by Atlanta Welding & Machine Company of Atlanta, Georgia, and later by the Atlanta plant of the Link-Belt Company. Darden Industries was, nevertheless, responsible for and controlled the design and specifications for machines manufactured for, and sold by it.

13. In its first fiscal year ending January 31, 1947, Darden Industries sold some 30 Rockercrete Machines and had a total sales of block machines and auxiliary equipment in the amount of $282,765 of which $97,250 was from sales of block machines.

14. The Rockercrete was a small, inexpensive cored pallet, semi-automatic type machine selling for about $3,250. A fully automatic vibrating machine developed by Millard Warren of Knoxville, Tennessee, was investigated by Darden in 1946. Darden entered into an oral agreement with Warren to produce and market this machine as the "Warren 800." The arrangement with Link-Belt was enlarged to provide that Link-Belt would fabricate the "Warren 800" machine to the specifications of Darden Industries. The first order for the fabrication of three "Warren 800" machines was placed with Link-Belt on October 24, 1946, but it was necessary for Link-Belt to tool up to make the "Warren 800." The first delivery of a "Warren 800" machine manufactured by the Link-Belt Company was made in June, 1947. There was no written contract with Link-Belt and the price of the machines that it built was not definitely fixed. They were supplied on open purchase order with payment made on the basis of cost plus ten per cent (10%). A deposit of $15,000 was maintained with Link-Belt to secure payment for the machines. Darden's selling price for the "Warren 800" was around $20,000. In January, 1946, Gelbman advised Darden and representatives of Besser Company and Stearns that, in Gelbman's opinion, Darden's Rockercrete Machine infringed patents owned by Gelbman and Andrus and licensed to Stearns and Besser Company. Gelbman informed Besser that he was going to Atlanta to investigate the matter and was advised by Besser that he had already been to see Darden and, after securing copies of the Gelbman-Andrus patents, was going to return to Atlanta for further investigation. Nothing further was done until the summer of 1946 when Eugene F. Olsen, the president of Stearns, wrote to Gelbman and to Besser suggesting that they revive the matter and proceed with it.

15. Stearns and Besser Company were clearly interested in protecting their rights as licensees under the Gelbman-Andrus patents, but it is also clear that defendants were concerned about Darden as a competitor and not merely as a patent infringer. On July 8, 1946, Olsen wrote to Besser, urging that Besser give Gelbman a report on the Darden matter. He said, in part:

> "I think it is important that we move in on this case (if it is justified at all) because I know that Darden has some rather ambitious plans including the manufacture of a high production vibrator machine which has been pretty well proven out in the field in a way that would make it really effective competition."

By letter from Haakon Paulson, Distribution Manager of Besser Company, to Gelbman on July 31, 1946, Besser Company stated that Darden was in-

fringing and that suit should be started. Paulson stated further:

"We can further protect the future of the industry in which we are all interested by greatly reducing or eliminating the avalanch of small machines that are now flooding the market. Many of these machines make an inferior block and this, together with the lack of information for these small operations and the lack of interest of the sellers of this equipment, will make for another period of inferior blocks and thereby greatly retard the industry."

16. In addition to the proposed infringement suits, defendants in their correspondence discussed as further moves against Darden:

a. Publicity about the infringement action.

b. Publicity to the effect that only Stearns and Besser Company were licensed under the Gelbman-Andrus patents along with a warning against infringement of these patents by others.

c. Giving notice to the home office of Link-Belt that their branch plant in Atlanta was making block machines which infringed the Gelbman-Andrus patents.

17. It was not until November, 1946, that defendants or Gelbman obtained a legal opinion in regard to the alleged infringement of the Gelbman-Andrus patents by the Rockercrete Machine.

18. Both Stearns and Besser Company purchased chain, bearings and other items from Link-Belt. Defendants expected and desired that giving notice to Link-Belt of the impending patent action would result in Link-Belt's refusal to ship any more machines to Darden Industries until the matter was settled.

19. On January 14, 1947, Gelbman and Andrus brought suit against Landis Concrete Products of Landisville, New Jersey, a customer of Darden Industries, alleging infringement of patents Nos. 2,276,676 and 2,366,780, two of the patents covered by the 1942 joint license agreement. Stearns and Besser Company shared the expense of this litigation as required by the 1942 agreement.

20. On January 15, 1947, Darden requested of Gelbman a license under the Gelbman-Andrus patents. This request was relayed to the Besser Company and Stearns to determine if Besser Company and Stearns would consent to granting such a license. Both Besser Company and Stearns refused to give their consent.

21. The advertisements contemplated by the correspondence mentioned in Finding 18 appeared in the February, 1947, issues of leading periodicals of the concrete block plant industry. These advertisements featured the words "vibration under pressure." The text of the advertisement in relevant part stated that Louis Gelbman, inventor, announced that only Besser Company and Stearns were licensed to make block machinery under his patents. The advertisement then listed the numbers of the patents covered by the joint license agreement and concluded with a warning against infringement.

22. These advertisements were intended to make the industry "patent conscious" and to give the impression that the Gelbman patents had something to do with making blocks with vibration or vibration under pressure. During and prior to February, 1947, Besser Company advertised that it was licensed under Gelbman's "basic vibration patents." During and prior to February, 1947, Stearns advertised that it was licensed under "basic Gelbman vibration patents." Besser Company, in 1939, had taken the position that "vibration with pressure" was broadly disclosed prior to the Gelbman patents. All defendants knew that in 1942 two claims of the Gelbman patents were held invalid as there was no novelty in vibrating or reciprocating a mold.

23. With the advice of counsel, plaintiffs, in February, 1947, started suit in Cook County, Illinois, against Gelbman, Olsen and Besser asserting that these advertisements and other alleged activities of the defendants constituted unfair competition.

24. On February 18, 1947, Besser, Olsen and one Stark, patent attorney for Besser Company, called on the president and other officials of Link-Belt Company in Chicago, Illinois. They notified Link-Belt that the machines being made in Link-Belt's Atlanta plant for Darden infringed patents which they controlled and that suit had been started against a user of one of these machines. The president of Link-Belt decided that Link-Belt should discontinue supplying Darden Industries with materials that were claimed to infringe until the patent controversy was settled. Darden was advised of this decision by the manager of Link-Belt's Atlanta plant on February 20, 1947.

25. Plaintiffs, in the absence of a source of supply for machines, were not capable of financing the defense of the patent infringement suit which had been instituted by Gelbman and Andrus in New Jersey or the prosecution of the unfair competition suit which they had started in Illinois. Darden Industries was threatened with immediate destruction of its business and with financial ruin unless its established source of machines could be maintained. In this dilemma, Darden decided that there was nothing he could do except to settle the matter on the best terms possible. On February 20, 1947, Darden signed an agreement with Gelbman which provided:

a. That Darden and Darden Industries would be licensed to make, sell and service 32 Rockercrete, three "Warren 800" and 30 mixers.

b. That Darden and Darden Industries, after the above quantities had been disposed of, would discontinue the manufacture, sale or use of block machinery, including machines of the type mentioned and other mixers.

c. That Darden would withdraw the suit for unfair competition mentioned in Finding 23.

d. That the agreement was to be supplemented and replaced by a formal agreement to be later signed by Darden.

26. The formal agreement contemplated by the preliminary agreement of February 20 was executed by Darden on March 17, 1947, by Gelbman and Andrus on March 21, 1947, and by Darden for Darden Industries on April 7, 1947. That agreement referred to the preliminary agreement of February 20, 1947, and provided in part:

a. A license to Darden Industries under Patent Nos. 2,275,676 and 2,366,780 to complete, use, and sell machines embodying the invention claimed with the license being limited to a total of 35 machines including not more than five multiple block machines.

b. That Darden Industries was not to be restricted in the sale of repair parts or the rendering of service to these machines or any other machines heretofore sold by Darden or Darden Industries.

c. That after 35 machines were completed and sold, Darden and Darden Industries would cease from further making and selling any machines covered by any of the claims of Patent No. 2,275,676.

d. That Darden's suit for unfair competition would be dismissed.

e. That the patent infringement suit in New Jersey against Landis Concrete Products would be dismissed.

27. After this agreement was entered into by the plaintiffs and Gelbman, Darden Industries advertised that it was licensed under Gelbman's patents and thereafter Darden Industries sold its machines as a licensee under the Gelbman patents.

28. Under the provisions of the limited license agreement granted to Darden Industries by Gelbman, the Company was authorized to sell 30 Rockercrete and five "Warren 800" machines. In the period following the granting of that license to the time of this suit, Darden Industries was able to dispose of only 16 of the 30 Rockercrete machines. The last of the five "Warren 800" machines authorized was sold in 1951.

■ 29. Plaintiff sought to prove damages by reviewing the history of Darden Industries and making a prophecy as to what the future profits would be in the absence of interference by defendants. In order to bolster this prophecy, they reviewed the history of Besser and Stearns during the same period. Although it is true that in a case of this kind damages do not have to be proved to an exact certainty, they cannot be based upon speculation and conjecture. In a highly competitive business, such as that involved in this case, there are so many factors involved that no reasonable person would conclude that the method adopted by the plaintiffs would give even an approximate measure of the damages sustained.

■ 30. This is not to say that the evidence submitted to support the plaintiffs' theory should be disregarded. Loss of prospective profits may constitute an element of recoverable damages. Certainly a prospective purchaser of Darden Industries, as a going concern, would give serious consideration to this evidence. At the time the defendants started their campaign to destroy Darden Industries' business, that Company had acquired some goodwill and going concern value. It had a small staff qualified to carry on the business. It had established some credit and satisfactory arrangements with Link-Belt, its supplier of machines.

31. The restrictions placed upon the operations of Darden Industries by the 1947 agreements, which it was forced to accept, limited the future development of the Company.

32. Giving consideration to all the factors, it is determined that Darden Industries suffered damages due to the illegal conduct of defendants in the amount of fifteen thousand dollars ($15,-000).

33. Darden, individually, has failed to show any injury from the defendants' activities apart from his interest as officer and stockholder of Darden Industries.

■ 34. Plaintiffs were represented by able counsel, who spent much time in the preparation and trial of the case. In essence, the case was relatively simple so far as the liability was concerned. Much of the evidence used in this trial was substantially the same as United States v. Besser Mfg. Co., supra. Most of the time and effort of the attorneys was spent in attempting to establish their theory of damages. Basing his opinion quite largely upon the time spent by plaintiff's counsel; a highly respected and competent member of the local bar gave his opinion as to the value of these services. Had it been possible for the plaintiff's counsel to sustain the theory of damages which they advanced, the opinion of this expert would have been more persuasive. However, the fact remains that plaintiff's counsel were not successful. It follows that reasonable attorneys' fees must be fixed in accordance with the usual considerations including the difficulty of the litigation, the amount recovered, time and labor spent, the learning, skill and experience required, and the responsibility undertaken. A reasonable allowance to Darden Industries for attorneys' fees is determined to be ten thousand dollars ($10,000).

## Conclusions of Law

1. The Court has jurisdiction of the parties and of the subject matter of the claims of the plaintiffs, 15 U.S.C.A. § 15.

■ 2. In addition to the prima facie effect that the Court is compelled to give to the decision of the courts in U. S. A. v. Besser, supra, sufficient evidence has been offered to establish that all of the defendants herein have committed acts forbidden by the antitrust laws of the United States and that these acts have injured the business of Darden Industries entitling it to some of the relief sought, 15 U.S.C.A. §§ 15 and 16.

■■ 3. Where the tort itself is of such a nature as to preclude ascertainment of the amount of damages with certainty, it would be a perversion of fundamental principles of justice to deny all relief to the injured person, and thereby

relieve the wrongdoer from making any amend for his acts. In such case, while the damages may not be determined by mere speculation or guess, it will be enough if the evidence shows the extent of the damages as a matter of just and reasonable inference although the result be only approximate. The wrongdoer is not entitled to complain that they cannot be measured with the exactness and precision that would be possible if the case, which he alone is responsible for making, were otherwise. Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555, 51 S.Ct. 248, 75 L.Ed. 544.

4. Plaintiff, Darden Industries, is entitled to judgment against the defendants for threefold the damages found to be sustained by it in Finding 32, a total sum of $45,000. It is also entitled to recover its reasonable attorneys' fees as found in Finding 34 and its costs, 15 U.S.C.A. § 15.